IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 10, 2015 Session

**STATE OF TENNESSEE v. JERRY LEWIS TUTTLE**

**Appeal from the Circuit Court for Maury County**
**Nos. 21695, 22091      Stella L. Hargrove, Judge**

_____

**No. M2014-00566-CCA-R3-CD – Filed September 8, 2015**

_____

Following the execution of a search warrant for his property and residence, the Defendant-Appellant, Jerry Lewis Tuttle, was indicted by the Maury County Grand Jury in case number 21695 for possession of .5 grams or more of cocaine with intent to sell, possession of not less than one-half ounce nor more than ten pounds of marijuana with intent to sell, and being a felon in possession of a firearm. He was also indicted by the Maury County Grand Jury in case number 22091 for conspiracy to possess marijuana in an amount over 300 pounds with intent to sell or deliver within 1000 feet of a school, conspiracy to commit money laundering, money laundering, possession of a firearm with the intent to go armed during the commission of a dangerous felony, and acquiring or receiving property subject to judicial forfeiture pursuant to Tennessee Code Annotated section 39-11-703. The Defendant-Appellant filed motions to suppress the evidence seized and to dismiss the forfeiture count, which were denied by the trial court following a hearing.[1] At trial, the Defendant-Appellant was convicted in case number 21695 of the lesser included offense of simple possession of cocaine and the charged offense of possession of marijuana with intent to sell; the count charging him with being a felon in possession of a firearm was dismissed. In case number 22091, the Defendant-Appellant was convicted of the lesser included offense of conspiracy to possess marijuana in an amount over 300 pounds with intent to sell or deliver as well as the charged offenses of conspiracy to commit money laundering, money laundering, and possession of a firearm with the intent to go armed during the commission of a dangerous felony. Following a bench trial on the judicial forfeiture count, the trial court denied the forfeiture of several items seized but ordered the forfeiture of other items, including the $1,098,050 that is at issue on appeal. After a sentencing hearing on the other counts, the trial court imposed an effective sentence of fifty years with a release eligibility of thirty-five percent. On appeal, the Defendant-Appellant argues: (1) that the search of his property violated his constitutional right against unreasonable searches and seizures because the affidavit in

_____
[1] The Defendant-Appellant then sought an interlocutory appeal regarding the denial of these motions, which this court denied on August 26, 2013. See State v. Jerry Tuttle and Tammy Tuttle, No. M2013-01535-CCA-R9-CD (Tenn. Crim. App. Aug. 26, 2013).

support of the search warrant did not provide probable cause for the issuing judge to believe that evidence of a crime would be found on his property and in his home; (2) the evidence is insufficient to sustain his conspiracy convictions; and (3) he is entitled to the return of the $1,098,050 because the cash seized was obtained by him more than five years prior to the seizure and because the seizing agent failed to deliver a notice of seizure to him at the time the cash was seized. Upon review, we reverse the Defendant-Appellant's convictions. However, we affirm the trial court's judgment in regard to the forfeiture proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part; Reversed in Part and Remanded**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. joined. ROGER A. PAGE, J. dissenting and concurring in part.

John S. Colley, III, Columbia, Tennessee, for the Defendant-Appellant, Jerry Lewis Tuttle.

Herbert H. Slatery III, Attorney General and Reporter; Andrew Coulam, Assistant Attorney General; Mike Bottoms, District Attorney General; and Brent Cooper, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**Pre-Trial Hearing on Motion to Suppress.** The Defendant-Appellant argued that he was entitled to suppression of the evidence seized from his property pursuant to the search warrant on the basis that the following paragraphs of Trooper Shawn Boyd's affidavit contained false statements:

18. . . . As further described below Christopher TUTTLE [the Defendant-Appellant's son] used [the Defendant-Appellant's] residence on March 16, 2012 and April 2, 2012 to off load shipments of marijuana in the excess of 100 pounds.

37. At approximately 4:20 p.m. S/A Stephen advised me that they received a cell phone GPS location of MEDINA phone and it placed him on Dugger Road in Culleoka, Tennessee. S/A Stephen was able to provide the numeric for that GPS query, they are as follows: 35.47379, -87.02369, the GPS location placed [CLETO] MEDINA

on Dugger Road at 4:24 p.m., on April 2, 2012. As described earlier in this affidavit [CHRISTOPHER] TUTTLE was found at this same location during surveillance that took place on March 16, 2012. Also as described earlier in this affidavit the 20th Judicial Drug Task Force executed a search warrant at 4571 Dugger Road, Culleoka, TN in connection with their investigation in 2000. During the search $112,000.00 in cash was seized from the residence which at the time belonged to [CHRISTOPHER] TUTTLE'S father.

Because the Defendant-Appellant alleged that Trooper Boyd made false statements with the intent to deceive and/or statements made in reckless disregard for the truth in presenting his affidavit to the issuing judge, the court heard testimony from several witnesses prior to determining the suppression motion.

Shawn Boyd, a Tennessee Highway Patrolman currently assigned to the Drug Enforcement Agency (DEA) Task Force in Nashville, testified that he drafted the affidavit in support of the search warrant in this case. He stated that in March 2012, he took a statement from Adrian Davis. Prior to giving this statement, Davis had been stopped for a traffic violation, and a trooper discovered drugs on Davis's person. The trooper gave Davis the phone number to contact the DEA if he wanted to cooperate. Davis subsequently contacted Trooper Boyd and informed him that Christopher Tuttle, the Defendant-Appellant's son, was involved in a major marijuana conspiracy. Davis's information was corroborated by other DEA sources who determined that Davis was involved with the same drug cartel members as Christopher Tuttle. Davis also stated that Christopher Tuttle drove a white Nissan truck and that Christopher Tuttle's "whole family" was involved in selling drugs.

Trooper Boyd stated that paragraph 13 of his affidavit talked about information that was obtained by the Birmingham, Alabama DEA regarding the March 16, 2012 shipment of drugs that was being transported by Cleto Medina's brother, Biato Jaramillo. He said the Birmingham DEA had observed suitcases, believed to contain drugs, and had located the pick-up and drop-off of these suitcases based on wiretaps obtained from the DEA agents in Texas, who had learned that there were drugs traveling from Texas to Birmingham, Alabama.

Trooper Boyd explained the following sentence in paragraph 18 of his affidavit: ". . . As further described below Christopher TUTTLE used [the Defendant-Appellant's] residence on March 16, 2012 and April 2, 2012 to off load shipments of marijuana in the excess of 100 pounds." He said that although he used the language "[a]s further

described below," no one ever observed Christopher Tuttle using the Defendant-Appellant's residence to offload marijuana on March 16, 2012 and April 2, 2012. Trooper Boyd said that this section of paragraph 18 was "probably miswording, more than anything" but asserted that he included this information because he and other officers were able to conduct visual surveillance with Christopher Tuttle and Jaramillo until shortly before the transfer took place on March 16, 2012. Although he was not able to observe Christopher Tuttle and Jaramillo at the Defendant-Appellant's residence on March 16, 2012, he saw that Christopher Tuttle's truck was parked there only a few minutes after officers believed the transfer of marijuana had taken place. He also included the information in paragraph 18 based on the ping of Medina's phone on April 2, 2012, that placed Medina on the Defendant-Appellant's property. He denied intentionally putting anything false in his affidavit and said he had "no reason to mislead" the judge who granted the search warrant for the Defendant-Appellant's property.

Trooper Boyd explained that on March 16, 2012, officers had observed Christopher Tuttle and Jaramillo at a gas station together, but no transfer of drugs occurred there. From the gas station, Christopher Tuttle and Jaramillo drove down Highway 373 and then turned onto a little road near the school where the officers terminated surveillance for fear of being discovered. Shortly thereafter, officers received information that Christopher Tuttle had family living at 4571 Dugger Road. A few minutes later, Trooper Boyd and Officer Breedlove then independently drove by the Defendant-Appellant's residence and observed Christopher Tuttle's truck parked in the driveway. He acknowledged that he never observed Jaramillo's or Medina's vehicle on the Defendant-Appellant's property after the drug transactions were believed to have taken place. Trooper Boyd stated that he knew of no other place where a transfer of the drugs could have occurred on March 16, 2012.

Trooper Boyd stated that Christopher Tuttle and Medina met on April 2, 2012, at a Shell gas station while under surveillance by law enforcement and that no transfer of drugs took place at that location. Based on the information he received from the DEA in Birmingham, he knew that the drugs would be concealed in suitcases. After meeting at the Shell gas station, Christopher Tuttle and Medina traveled to an area near Dugger Road, where the officers terminated contact for fear of being discovered. Shortly thereafter, Agent Shawn Steven informed Trooper Boyd that he had received a real-time ping for Medina's phone, which placed Medina on Dugger Road. Trooper Boyd stated that when he plotted these GPS coordinates, they pinpointed a location on the Defendant-Appellant's property, though not at the Defendant-Appellant's residence where Christopher Tuttle's truck had been parked on March 16, 2012. He acknowledged that he had no evidence that any drug transactions took place in the driveway of 4571 Dugger

Road or at the Defendant-Appellant's residence at that address. He said he later learned that the April 2, 2012 transaction took place on a dirt road on the Defendant-Appellant's property and believed that Medina would testify as to that fact if he testified at trial.

Trooper Boyd acknowledged that prior to preparing the affidavit, Sprint Nextel had informed law enforcement that the ping of Medina's phone was accurate to a radius of forty-one meters. He further acknowledged that the spot referred to in paragraph 37 of the affidavit noting where Christopher Tuttle's truck was parked was not within forty-one meters of the spot where Medina's phone was pinged. Moreover, although he stated in paragraph 37 of his affidavit that Medina's phone had been pinged to the "same location" where Christopher Tuttle had parked his truck on March 16, Trooper Boyd claimed that he had meant the "same area."

Trooper Boyd admitted that the last activity that he saw on the Defendant-Appellant's property was on March 16, 2012, when he observed Christopher Tuttle's truck parked outside the Defendant-Appellant's residence. He stated that he did not apply for this search warrant until April 23, 2012 but believed that evidence of illegal activity would still be in this area based on the numerous phone calls that had been intercepted, the Sprint ping of Medina's phone that placed Medina on the Defendant-Appellant's property on April 2, 2012, and an intercepted phone call wherein Christopher Tuttle stated that he had weighed the marijuana he received on April 2, 2012, and claimed he had been shorted.

Trooper Boyd acknowledged that he never personally observed hundreds of pounds of marijuana being offloaded at the Defendant-Appellant's residence. He further asserted that it was never his belief that all of the drugs that were transferred to Christopher Tuttle stayed at the Defendant-Appellant's residence. Instead, he believed that the Defendant-Appellant's property was the "meet and exchange location" between Christopher Tuttle and the drug suppliers because it was a private place where crimes could be committed without detection. Trooper Boyd asserted the evidence law enforcement was hoping to find pursuant to the search warrant of the Defendant-Appellant's property and residence included "[d]rugs, money, drug records, telephone records, scales and packaging material, names and information regarding coconspirators, . . . guns, [the] identity of subject[s] living at 4571 Dugger Road, Culleoka, Tennessee, evidence of involvement of the subject or subjects living at [that address]." In response to questioning from the trial court, Trooper Boyd stated, "We had every reason to believe that [Christopher Tuttle] was going to [the Defendant-Appellant's] residence [at 4571 Dugger Road], but the fact that we followed him as far as we could and then, within a few minutes later, [Christopher Tuttle's truck is] sitting at the residence, there's no way

[he could have gone anywhere else]—you know, because we were at all areas. Nobody had [seen Christopher Tuttle] coming or going, after he got back to that area."

Shawn Steven, a special agent with the DEA Task Force in Birmingham, Alabama, testified that he conducted an investigation involving two Hispanic brothers, Cleto Medina and Biato Jaramillo, who were receiving several-hundred pound shipments of marijuana from Texas and were distributing the marijuana to several customers in Tennessee. He stated that after conducting federal wiretaps on Medina's phone, he intercepted phone calls between Medina and Christopher Tuttle regarding marijuana shipments. Agent Steven said that at that point, his office began to coordinate with DEA out of Nashville, Tennessee, which included working with Trooper Shawn Boyd.

On April 2, 2012, Agent Steven conducted surveillance on Medina as he was transporting a load of marijuana from Alabama to Tennessee. He saw Medina take several suitcases off a bus in Birmingham and transport the suitcases to a home to store them. That day, he intercepted several phone calls between Medina and Christopher Tuttle arranging a time to exchange the marijuana. He later followed Medina when he took exit 32 from Interstate 65. Agent Steven and another agent stayed at exit 32 while Tennessee agents took over the surveillance of Medina. Approximately one hour later, Agent Steven saw Medina, who was alone, pull onto Interstate 65.

After learning from Trooper Boyd that officers had to terminate surveillance on Christopher Tuttle and Medina for fear of being discovered, Agent Steven obtained a GPS ping on Medina's cell phone from Sprint, meaning that Sprint sent a signal to Medina's cell phone which returned the latitude and longitude coordinates of Medina's phone at the moment when it was pinged. Agent Steven acknowledged that the accuracy of pinged locations varied but that Sprint had informed him that the ping of Medina's cell phone had a 41-meter degree of accuracy, which equates to a 123-foot degree of accuracy. Agent Steven stated that the 41-meter radius of the coordinates included both the Defendant-Appellant's property and a neighbor's home and property but did not include the Defendant-Appellant's residence. He later determined that this neighbor had no involvement in the case. When Agent Steven received the coordinates from the ping of Medina's phone, he gave them to Trooper Boyd, who included these coordinates into his affidavit for the search warrant. At the time, he told Trooper Boyd that the ping of Medina's phone was on Dugger Road in Culleoka, Tennessee.

Agent Steven acknowledged that it would be false to state that the ping of Medina's phone on April 2, 2012, occurred at the same location where Christopher Tuttle's truck was parked on March 16, 2012, because they were two different locations.

He stated that the investigation centered on the property at 4571 Dugger Road because agents had seen vehicles meet and travel to that location to exchange marijuana on March 16, 2012. He acknowledged that agents did not see the actual exchange, although agents saw Christopher Tuttle's vehicle parked at the Defendant-Appellant's residence and saw Biato Jaramillo's vehicle leaving the area.

Ben Sellers, the owner of a global positioning system (GPS) fleet management company named C.T.S., testified on behalf of the Defendant-Appellant regarding the accuracy of the pinged location of Cleto Medina's phone call as stated in paragraph 37 of Trooper Boyd's affidavit. Sellers stated that C.T.S. provides global positioning systems that can track the location of a client's vehicles. Using his company's technology and his cellular phone, Sellers drove to the GPS coordinates delineated in paragraph 37 of Trooper Boyd's affidavit, which took him to an unmarked dirt road that was 125 yards from Dugger Road, approximately 140 yards from the Defendant-Appellant's residence at 4571 Dugger Road, and only 45 to 50 feet from a neighbor's home at 4585 Dugger Road. Sellers asserted that the driveway in front of the Defendant-Appellant's residence would have different coordinates than the ones listed in paragraph 37 of Trooper Boyd's affidavit.

Sellers acknowledged that several factors could impact the accuracy of GPS coordinates, including the quality of the cell phone's GPS chip, the presence of signal obstructions such as trees and cloud cover, and the number of available satellites. Sellers noted that Sprint Nextel had pinged Medina's cell phone to obtain the GPS coordinates, but he could not determine the accuracy of this ping in arriving at the coordinates for Medina's phone. Sellers acknowledged that Google Maps, an internet service, stated that the coordinates in paragraph 37 were located at 4571 Dugger Road, the Defendant-Appellant's property.

William Doelle, a lieutenant with the Maury County Sheriff's Department, testified that he was present on April 24, 2012, when the search warrant was executed on the Defendant-Appellant's property at 4571 Dugger Road. He stated that the property, which was approximately six acres, included the Defendant-Appellant's residence that sat close to the road and a dirt path that ran along the back of the property. Lieutenant Doelle stated that when the officers executed the search warrant, they searched the entire six-acre tract of land owned by the Defendant-Appellant.

Lieutenant Doelle stated that he had been to the location of the ping of Medina's phone on April 2, 2012, and acknowledged that he could not see the Defendant-Appellant's residence from the location of the ping because it was a good distance away.

However, he asserted that the location of the ping was on the Defendant-Appellant's property.

**Pre-Trial Hearing on the Dismissal of the Forfeiture Count.** Joel Rowney, a detective with the Nashville Police Department assigned to the Judicial Task Force, testified that he arrived at 4571 Dugger Road on April 24, 2012, while the search warrant was being executed, although the residence had already been searched. He stated that the Defendant-Appellant and his wife were present and that they answered a few questions before refusing to speak further. Detective Rowney stated that the majority of the $1,098,050 in cash that was seized had been found in an ammunition can covered in dirt, which led him to believe that this money had been buried. He also noted that the rubber bands bundling the cash had adhered to money. When the $1,098,050 was seized in this case, he noted that all of the bills had been issued prior to the year 2000 and concluded that this money had been buried or concealed for over twelve years.

Detective Rowney stated that he did not issue a notice of seizure of the $1,098,050 to the Defendant-Appellant on the date it was seized. Instead, his secretary sent the notice of seizure for this money to the Defendant-Appellant by certified mail at a later date, although he could not recall the specific date that it had been mailed. He explained that although the actual notice of seizure that was mailed stated that the notice had been delivered to the Defendant-Appellant on April 24, 2012, the notice had not been delivered to the Defendant-Appellant until sometime after that date. Detective Rowney said that for the last eleven years, he had always listed the date of delivery of the notice as the date the property was seized.

Detective Rowney asserted that when a large amount of currency is seized, the standard procedure is to take the money to a bank to ensure an accurate count and not to give the owner a notice of seizure at that time. He explained that a notice of seizure with the correct amount of money is later sent to the owner by certified mail. Detective Rowney stated that he had been mailing notices of seizures regarding large amounts of money via certified mail as long as he had been working on the task force, and it had never been an issue in prior cases.

Detective Rowney said he informed the Defendant-Appellant at the time of the money's seizure of this money that he would get a notice via certified mail that would explain how he could get his money back. He explained that following its seizure the money was sealed in a box with his sergeant's initials and locked in a safe overnight. Notice was given to the DEA that money was seized, although the notice did not have an amount. Detective Rowney took the money to a bank to be counted the day after it was

seized because the bank was closed by the time the seizure was complete. Detective Rowney and his sergeant, as well as two bank personnel, were involved in counting the money. In response to questioning from the trial court, Detective Rowney stated that he put the date of seizure as the date of delivery of the notice to the Defendant-Appellant because that was how he had been trained to complete a notice of seizure sent by certified mail.

**Trial.** Trooper Boyd testified consistently with his April 23, 2012 affidavit and his testimony at the suppression hearing. In addition, he stated that in early 2012, he was contacted by Sergeant Wayne Dunkleman, who told him that he had stopped Adrian Davis on a traffic stop and that Davis had marijuana and some pills on his person. Because Davis had information that he wanted to share with the DEA, Sergeant Dunkleman gave him Trooper Boyd's phone number. Shortly thereafter, Davis spoke with Trooper Boyd in early March 2012 and provided his telephone number. Trooper Boyd put Davis's telephone number in the DEA database, and he was contacted by the DEA in Georgia, Alabama, and Texas because Davis's telephone number had been associated with cases those offices were investigating. The DEA offices informed Trooper Boyd that Davis had been talking with a major drug organization out of Alabama. The Alabama DEA asked Trooper Boyd about another subject, who went by the name "El Rojo." Trooper Boyd explained that Davis had originally told him about Christopher Tuttle's involvement with the drug operation, and he later learned that Christopher Tuttle went by the nickname "El Rojo," which translates to "Red." He obtained additional information about Christopher Tuttle from one of the other agencies and began to research Christopher Tuttle's criminal history. He also used wiretaps and surveillance to monitor Christopher Tuttle. Trooper Boyd stated that the Alabama DEA informed him that they had just observed a transaction taking place in Birmingham and believed that a shipment of marijuana was coming into Tennessee on March 16, 2012.

After learning of this information, Trooper Boyd's office set up surveillance at the state line on March 16, 2012, where they intercepted the maroon Ford sport utility vehicle (SUV) with an Alabama tag that had been described by the DEA, and they followed the vehicle. The maroon SUV exited Interstate 65 at exit 37 and stopped at a Shell gas station. Trooper Boyd stated that he was following the maroon SUV but did not exit immediately and then circled back to the gas station. By the time Trooper Boyd arrived at the Shell station, the maroon SUV and a white Nissan Titan truck with a Tennessee tag pulled out from the gas station. Trooper Boyd stated that he followed the vehicles to the Culleoka school, and other officers followed them into a rural area of Culleoka.

When the tag for the white Nissan Titan was run through the registration database, it was found to be registered to Christopher Tuttle. Trooper Boyd then learned that Christopher Tuttle had family members living at 4571 Dugger Road in Culleoka, Tennessee. Approximately fifteen to twenty minutes after surveillance on the vehicles had been terminated, Trooper Boyd drove by the Defendant-Appellant's residence and observed Christopher Tuttle's white Nissan Titan truck parked in the driveway of the residence. Trooper Boyd stated that he never saw Christopher Tuttle outside of his vehicle that day and never saw the Defendant-Appellant, Christopher Tuttle's father, that day. He acknowledged that he did not see anyone unloading marijuana from the truck or into the truck. By the time he drove by 4571 Dugger Road and saw the white Nissan Titan truck, the maroon SUV was gone. Trooper Boyd stated that Christopher Tuttle's truck was not parked at the Defendant-Appellant's home for very long because it was later seen travelling on State Route 50.

After the surveillance on March 16, 2012, Trooper Boyd continued to talk to unnamed DEA officers in Alabama and Texas that had set up the wiretaps. Trooper Boyd also obtained a wiretap on Christopher Tuttle's phone and began monitoring his calls. On April 2, 2012, the DEA in Alabama contacted Trooper Boyd because they had witnessed a transaction in Alabama and believed there was another shipment of marijuana being transported from Alabama to Tennessee. The DEA informed him that the vehicle transporting the marijuana this time was a white Ford Expedition, that this vehicle was again meeting Christopher Tuttle, and that they were meeting at exit 32 near Culleoka, Tennessee. Trooper Boyd followed the white Ford Expedition to exit 32 from a distance and then trailed him down Highway 373 until the vehicle stopped at a Citgo gas station in Culleoka. By the time Trooper Boyd arrived at the Citgo station, the Expedition and another vehicle had already left. He stated that no officers followed the vehicle when they left the Citgo station. Trooper Boyd also admitted that on April 2, 2012, he never saw Christopher Tuttle, Christopher Tuttle's truck, or the Defendant-Appellant.

After April 2, 2012, Trooper Boyd began investigating other locations where Christopher Tuttle spent time. He located Christopher Tuttle's residence in Smyrna and monitored his actions there. He observed the white Nissan Titan truck at the Smyrna residence. He also followed Christopher Tuttle to Antioch, Tennessee, to the address of a person with whom Christopher Tuttle was conducting drug transactions. Eventually, Trooper Boyd obtained search warrants for three locations: the Defendant-Appellant's property located at 4571 Dugger Road, Christopher Tuttle's residence at 1126 Remuda Circle in Smyrna and the address in Antioch. He stated that all three of these search warrants were executed at approximately the same time on April 24, 2012.

-10-

During the search of the address in Antioch, officers recovered less than a pound of marijuana and approximately $11,000. During the search of the address in Smyrna, officers seized approximately eighty-five pounds of marijuana packaged into gallon-size plastic bags that had been placed inside plastic storage bins. Officers also seized a suitcase, over $100,000 in cash, the white Nissan Titan truck, a sport motorcycle, a shotgun, and a drug ledger in Smyrna. Trooper Boyd explained that the suitcase was seized because suitcases were used to transport the marijuana from Alabama to Tennessee on March 16, 2012, and April 2, 2012. He said that although four or five cell phones were seized from Christopher Tuttle's residence in Smyrna, there were no text messages or voice mails between Christopher Tuttle and his father, the Defendant-Appellant, regarding drug trafficking. He also stated that he knew of no communications between Medina or any other Hispanic drug dealers and the Defendant-Appellant. Christopher Tuttle's drug ledger, which was found in Smyrna, did not mention the Defendant-Appellant.

According to Trooper Boyd, the only evidence connecting the Defendant-Appellant to this offense was the similarity of the marijuana seized from both the Defendant-Appellant's and Christopher Tuttle's residences. Both marijuana seizures had the same packaging, the same compressed texture, and came from Mexico. Trooper Boyd stated that the plastic bags, wrapping material used to package the marijuana, and even the suitcases in Smyrna smelled of axel grease to hide the scent of the marijuana. However, no suitcases or packaging with axel grease were recovered from the Defendant-Appellant's residence. Although Trooper Boyd acknowledged that no law enforcement officers had seen any drugs during this investigation and had only seen suitcases being unloaded and loaded, he asserted that it was common not to see drugs during those investigations because individuals rarely carried drugs in the open.

Trooper Boyd said he monitored a conversation on April 11, 2012, wherein Christopher Tuttle informed Medina that he had received 157 pounds of marijuana instead of the promised 170 pounds. Based on this conversation, Trooper Boyd concluded that Christopher Tuttle had just finished weighing the April 2, 2012 shipment of marijuana in Smyrna. He acknowledged that nothing was found during the search of the residence in Antioch that was related to the Defendant-Appellant.

Trooper Boyd asserted that the Defendant-Appellant would not have to talk to anyone other than Christopher Tuttle if their agreement was to keep Christopher Tuttle's money for him at the Defendant-Appellant's residence and to allow Christopher to receive loads of marijuana on the Defendant-Appellant's property. Trooper Boyd said

that the Defendant-Appellant and Christopher Tuttle could have agreed to communicate about their illegal activities in person, which could explain why there were no incriminating text messages and cell phone calls between them.

Jimmy Mann, a Task Force Officer with the DEA in Nashville, testified that he assisted with surveillance in this case. On April 2, 2012, he drove to the Culleoka exit and waited at the Citgo gas station. At the time, he knew that he was looking for a Nissan Titan truck and a Lincoln Navigator. When he arrived, neither of these vehicles were present, and Officer Mann parked on the side of the building. Five minutes later, he saw a white Nissan Titan truck pull up to the gas pumps, and Christopher Tuttle exited the vehicle and began pumping gas. Approximately fifteen minutes later, he saw the Navigator pull into the gas station and park in front of him. Agent Mann identified the driver of the Navigator as Cleto Medina. He stated that Christopher Tuttle and Medina went inside the store together, came out, and got into their vehicles. They left the store at the same time, with Christopher Tuttle's truck leading the way and the vehicles travelling in the direction of 4571 Dugger Road. Officer Mann stated that he did not follow the vehicles after they left the Citgo gas station, although other agents picked up surveillance on the vehicles from that point forward. He acknowledged that the Defendant-Appellant was not in either of the vehicles that he observed on April 2, 2012.

Adrian Breedlove, a Task Force Officer with the DEA Task Force in Nashville, testified that on March 16, 2012, he conducted surveillance on a maroon Ford Expedition. He followed the Expedition and relayed information to other officers and agents conducting surveillance. He saw the Expedition take exit 37 from Interstate 65 and pull into a small gas station. He stated that a Hispanic male, later identified as Jaramillo, was the driver of the Expedition. Officer Breedlove discontinued his surveillance at the gas station because it became obvious that he was watching the driver of the Expedition. He left the gas station as another member of the surveillance team arrived. He later learned from other agents that a white Nissan Titan truck met the Expedition and that agents followed the vehicles until they lost the vehicles in Culleoka. Shortly after leaving the gas station, Officer Breedlove drove by the Defendant-Appellant's property at 4571 Dugger Road and saw a white Nissan Titan truck parked in the driveway. When he entered the tag into his database, he discovered that the truck belonged to Christopher Tuttle. Officer Breedlove admitted that he never saw Christopher Tuttle or the Defendant-Appellant on March 16, 2012.

Officer Breedlove stated that he took part in the search of the Defendant-Appellant's property on April 24, 2012. During this search, the Defendant-Appellant informed the agents that he had guns in the house, and the agents discovered a loaded .45

semiautomatic pistol under the couch cushions in the den as well as an unloaded nine millimeter pistol under the couch. The officers also discovered a rifle inside a case in a bathroom and a bolt-action rifle underneath a bed. The agents found four more rifles, rifle magazines, three shotguns, a .50 caliber muzzle loader, and a revolver in the master bedroom. They also found a large electronic scale that could weigh items up to thirteen pounds and a bag of marijuana on the top shelf of the master bedroom closet. A second bag containing smaller Ziploc bags of marijuana was also found in this closet. Officers also found between $20,000 and $22,000 in cash near the marijuana and the scales in the closet. In addition, a small scale and a bag of marijuana was found inside a drawer. A plastic bag containing cocaine and $75,000 in cash comprised of $100 and $50 dollar bills was found in a dresser in the master bedroom. A second small bag of cocaine was found inside a roll top desk in the den. A third bag of cocaine was discovered on a kitchen shelf above the refrigerator. Officer Breedlove opined that the bags of cocaine were for personal use.

The officers also found a money counting machine, other small bags of marijuana, a metal grinder commonly used to grind marijuana into a powder, various butts of marijuana cigarettes, and two pipes that smelled strongly of marijuana. Officer Breedlove stated that some of the marijuana found at the Defendant-Appellant's home had been "bricked up" and had not yet been processed for sale. He was unable to find an intact brick, like the ones found at the Defendant-Appellant's home, in the marijuana taken from Christopher Tuttle's home in Smyrna. Nevertheless, Officer Breedlove asserted that the marijuana found at both places had "similar packaging and pressing techniques." He also noted that the marijuana found at Christopher Tuttle's home in Smyrna and the marijuana found at the Defendant-Appellant's home in Culleoka had the same stems and seeds present. Officer Breedlove explained that the more the marijuana is "bricked up," the closer the marijuana is to the initial source. He also stated that when the marijuana is made ready for the retail dealers and end-users, it is divided into smaller quantities.

Officer Breedlove said that outside the Defendant-Appellant's home, the agents found a red and white Igloo cooler containing several marijuana plants in black trash bags. Inside the trunk of a Honda Civic parked directly in front of the Defendant-Appellant's home, the agents found a large green ammunition can, an Intratec nine millimeter semiautomatic pistol, a Cobra nine millimeter semiautomatic pistol with a flash muzzle suppressor, a Ruger .22 caliber semiautomatic pistol, a nine-shot .22 caliber revolver, a Dan Wesson 357 magnum six-shot revolver, a Sagem 7.65 millimeter semiautomatic pistol, a Galesi .22 caliber semiautomatic pistol, a Beretta model 28A .22 caliber semiautomatic pistol, a Derringer EXcam double-barrel pistol, a Delta Elite ten

millimeter semiautomatic pistol, a Glock model 27 .40 caliber semiautomatic pistol, and ammunition for these weapons. Significantly, the ammunition can contained $1,000,300 in $100 bills. When the officers found the contents of the Civic's trunk, the Defendant-Appellant stated, "They found my money."

The Defendant-Appellant claimed that he had saved this money from cutting hay. The Defendant-Appellant also stated that the marijuana and the drugs inside his home belonged to him and had come "from Mexicans." The Defendant-Appellant denied that his son, Christopher Tuttle, had anything to do with the marijuana found inside the residence. When Officer Breedlove pointed out that the marijuana found at the Defendant-Appellant's house was very similar to the marijuana found at Christopher Tuttle's home, the Defendant-Appellant denied that his marijuana had anything to do with his son. The Defendant-Appellant claimed that he had all of the guns for protection because there had been rumors that he had $1,000,000 buried on his property and there had been numerous trespassers who had tried to steal his money. The Defendant-Appellant denied that the ammunition can in the trunk of the Civic had been buried and claimed that he had put the ammunition can in the trunk of the Civic when he bought it a year earlier. He stated that he put his money in the Civic because he could easily watch over it. The Defendant-Appellant asserted that the money belonged to him, not to Christopher Tuttle. When he was asked about Christopher Tuttle's truck being at his home on March 16, 2012, the Defendant-Appellant replied that he may have been at work that day and had not seen Christopher Tuttle or any Hispanics near his home.

Officer Breedlove stated that the agents found evidence of farm activity but did not find any drug ledgers or any documents connecting the Defendant-Appellant to Christopher Tuttle, Jaramillo, Medina, or the drug trade.

Lieutenant William Doelle testified that officers seized approximately eight pounds of marijuana and nearly one-half ounce of cocaine from the Defendant-Appellant's property. In addition, officers seized approximately eighty-five pounds of marijuana from Christopher Tuttle's residence in Smyrna. Lieutenant Doelle stated that he catalogued several other items of personal property, believed to be the proceeds from the sale of illegal drugs, that were seized pursuant to the search of the Defendant-Appellant's property including a 2000 Ford F350 truck purchased in 2012, a 2002 Jaguar purchased in 2012, a 1987 Chevrolet truck purchased after 2008, a 2007 dirt bike, a 2005 Yamaha street motorcycle purchased in 2008, a 2008 Harley Davidson motorcycle purchased in 2011, a 2004 Dodge Dooley, a 2009 bailer, a hay mower purchased in 2009, and an eight-wheel rake purchased in 2007. He also found ten to twelve titles to vehicles that were not found on the Defendant-Appellant's property. He testified that on April 24,

2012, when the search warrant of the Defendant-Appellant's property was executed, the Defendant-Appellant had a felony conviction.

Lieutenant Doelle stated that according to tax records, the Defendant-Appellant, and his wife, Tammy Tuttle, made $15,075 in 2007 and $15,427 in 2008. In addition, tax records showed the Defendant-Appellant lost $194 in 2007 and made $1613 in 2008. He stated that the Defendant-Appellant received Social Security benefits in 2011 of $5,928. Evidence showed that the Defendant-Appellant's saving and checking accounts totaled approximately $20,000. Lieutenant Doelle said that while there was evidence that the Defendant-Appellant cut hay to earn income, he found no evidence of checks or lottery winnings that would have explained the over one million dollars found on the Defendant-Appellant's property.

Chris Hill, a representative with the Tennessee Board of Probation and Parole, testified that Christopher Tuttle was continuously incarcerated from August 5, 2000, to June 23, 2011.

Detective Rowney testified that the day after the cash was seized from the Defendant-Appellant's property, he and two supervisors took the cash to a bank to be counted on a machine. He stated that all of the cash was in $100 bills and had been issued prior to the year 2000. In addition, he noted that some of the rubber bands holding the cash bundles together had melted to the money. Detective Rowney opined that this cash had been out of circulation since 2000 because it contained no newer bills. Because of the age of the bills and the condition of the rubber bands, he assumed that the money had been hidden for over twelve years. However, Detective Rowney acknowledged that a person could remove cash from this stockpile, a portion at a time, and spend it without putting newer money with it. He also acknowledged that the total of the cash seized was approximately $1,098,050.00, which was not a flat one million dollars.

Cleto Medina testified that he had recently entered guilty pleas to crimes related to this case and that he was currently incarcerated. Medina testified that he had never seen the Defendant-Appellant. He stated that in March and April 2012, he brought loads of marijuana from Alabama to Tennessee. Specifically, he delivered marijuana to a man known as "Red" or "Rojo," whom he identified as Christopher Tuttle. Medina stated that he was aware of the following deliveries to Christopher Tuttle: two deliveries made prior to March 16, 2012 in other locations in middle Tennessee; the March 16, 2012 delivery made by his brother, Biato Jaramillo, in a maroon Ford Expedition; and the April 2, 2012 delivery made by Medina in his Lincoln Navigator. Medina stated that the marijuana was placed in suitcases for the deliveries and that each of the pre-March 16, 2012 deliveries

was for 100 pounds of marijuana. He stated that the March 16, 2012 delivery of marijuana was also for 100 pounds of marijuana and that the April 2, 2012 delivery was supposed to be 170 pounds of marijuana, although Christopher Tuttle later informed him that this shipment weighed only 158 pounds. He stated that the marijuana for these deliveries was packaged in blocks and was covered in axle grease.

Medina stated that on April 2, 2012, Christopher Tuttle instructed him to call him when he took exit 32, which he did. Then Christopher gave him directions to a gas station ten to fifteen minutes away. After meeting at the gas station, Medina followed Christopher Tuttle to an area in the woods, where he gave Christopher the delivery of marijuana, and Christopher gave him the cash. Medina stated that Christopher Tuttle was paying $675 for each pound of marijuana, mostly in $100 bills. After being shown an aerial photograph, Medina marked the narrow dirt road on the Defendant-Appellant's property as the location where the drug transaction occurred. He stated that this drug transaction could not be seen from the Defendant-Appellant's home. Following the drug transaction, Medina returned to the interstate via the route he had previously taken. Medina asserted that he never met with Christopher Tuttle again because he was arrested two or three weeks after the April 2, 2012 drug transaction.

**Post-Trial Forfeiture Hearing.** Phillip Taylor, a state investigator with the DEA Task Force in Nashville, testified extensively concerning his involvement with an investigation of Christopher Tuttle and the Defendant-Appellant in the late 1990's and early 2000's. Lieutenant Bill Doelle testified that during the Defendant-Appellant's trial, he discussed several items of personal property and vehicles that had been seized in April 2012 from the Defendant-Appellant's property but, based on guidance from the court, had not discussed several items of personal property that had been purchased prior to 2004. He detailed the previously omitted items of personal property that were seized in 2012 for the trial court, which included a car, trucks, and two tractors. Lieutenant Doelle acknowledged that he had no evidence that any of this property was acquired by the Defendant-Appellant in violation of any statute. In addition, he stated that there were smaller items of personal property, other than the ones discussed at this hearing and at trial, that were seized as well as approximately $20,000 in one bank account and approximately $27,000 in a second bank account. When questioned about the Defendant-Appellant's $600 per month Social Security checks that were deposited into the account holding around $27,000 and his revenue from his hay business, Lieutenant Doelle said he believed that there were drug proceeds in that account comingled with legitimate money, although he had been unable track any drug funds to that account. He also stated that all of the personal property that was seized was purchased or maintained with proceeds from the sale of illegal drugs, even though he could not identify the specific drug transactions that led to these proceeds.

-16-

He stated that the Honda Civic was seized in April 2012 because it had the ammunition can with over one million dollars in the trunk, not because it was purchased with drug proceeds. He stated that this can with one million dollars was covered in dirt and appeared to have been buried in the ground, much like the ammunition can containing the $112,000 that had been found in 2000. Lieutenant Doelle stated that he did not know when the Defendant-Appellant acquired or received the approximately one million dollars in this can and did not know of any drug transactions that resulted in the Defendant-Appellant acquiring the approximately one million dollars. He opined that the cash in the Honda Civic had not been acquired by the Defendant-Appellant within the last five years, although it appeared as if the Defendant-Appellant could readily access this money. He also said that in addition to the over one million dollars in cash in the ammunition can, large amounts of cash were found in a dresser and a closet in the Defendant-Appellant's home. While he acknowledged that the approximately one million dollars was comprised of bills issued prior to the year 2000, he was unsure of whether the money found inside the Defendant-Appellant's residence was also comprised of pre-2000 bills. Lieutenant Doelle acknowledged that it would take an entire lifetime to collect approximately $1,000,000 from disability payments or farming revenue, even if an individual had no expenses.

## ANALYSIS

**I. Constitutionality of the Search Warrant.** The Defendant-Appellant contends that the search of his property violated his constitutional right against unreasonable searches and seizures because the search warrant was not issued upon probable cause. Specifically, he claims that the affidavit in support of the search warrant did not establish probable cause for the magistrate to believe that evidence of a crime would be found on the Defendant-Appellant's property and home at 4571 Dugger Road, Culleoka, Tennessee. First, the Defendant-Appellant asserts that Trooper Boyd's supporting affidavit lacked a sufficient nexus between the property to be searched and the suspected illegal drug activity. Second, he argues that Trooper Boyd intentionally provided false information to the magistrate or, at the very least, recklessly provided false information that was essential to the establishment of probable cause. Finally, the Defendant-Appellant claims that the information in the affidavit was stale. For the reasons that follow, we agree with the Defendant-Appellant and conclude that the affidavit failed to provide probable cause for the issuance of the search warrant in this case.

The Defendant-Appellant filed a motion to suppress the evidence seized pursuant to the search warrant, which was denied by the trial court following a hearing. Our

standard of review applicable to suppression issues involves a mixed question of law and fact. State v. Garcia, 123 S.W.3d 335, 342 (Tenn. 2003). "'[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.'" State v. Cox, 171 S.W.3d 174, 178 (Tenn. 2005) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. In addition, the party who prevails in the trial court "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Id. Although deference is granted to the trial court's findings of fact, the application of the law to those facts is a question of law which this court reviews de novo. State v. Saine, 297 S.W.3d 199, 205 (Tenn. 2009) (citing State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)). The trial court's conclusions of law are also reviewed de novo. State v. Carter, 160 S.W.3d 526, 531 (Tenn. 2005) (citing State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000)).

The United States and Tennessee Constitutions state that search warrants shall issue only upon probable cause. U.S. Const. amend. IV; Tenn. Const. Art. 1, section 7. The Fourth Amendment to the United States Constitution asserts that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Article I, section 7 of the Tennessee Constitution similarly states "[t]hat the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures."

"As a general rule, a search warrant shall be issued only on the basis of an affidavit, sworn before a 'neutral and detached' magistrate, which establishes probable cause for its issuance." State v. Stevens, 989 S.W.2d 290, 293 (Tenn. 1999) (quoting State v. Jacumin, 778 S.W.2d 430, 431 (Tenn. 1989)) (citing State v. Moon, 841 S.W.2d 336, 338 (Tenn. Crim. App. 1992)). The affidavit must set forth facts upon which a magistrate, "reading the affidavit in a common sense and practical manner, can find probable cause for the issuance of a search warrant." State v. Henning, 975 S.W.2d 290, 294 (Tenn. 1998) (citing State v. Bryan, 769 S.W.2d 208, 210 (Tenn. 1989)). In other words, the affidavit "must set forth facts from which a reasonable conclusion might be drawn that the evidence is in the place to be searched." State v. Smith, 868 S.W.2d 561, 572 (Tenn. 1993) (citations omitted). "A finding of probable cause by the issuing magistrate is entitled to great deference." State v. Yeomans, 10 S.W.3d 293, 296 (Tenn. Crim. App. 1999) (citing State v. Melson, 638 S.W.2d 342, 357 (Tenn. 1982)); see Jacumin, 778 S.W.2d at 431-32.

The test for probable cause is whether "'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Grubbs, 547 U.S. 90, 126 S.Ct. 1494, 1499 (2006) (quoting Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Moreover, an affidavit supporting the application of a search warrant must contain more than "conclusory allegations" on the part of the affiant. State v. Smotherman, 201 S.W.3d 657, 662 (Tenn. 2006) (citing Carter, 160 S.W.3d at 533). However, this court "must interpret affidavits in a commonsense and realistic fashion, eschewing [a] grudging and negative attitude and recognizing that affidavits for search warrants are normally drafted by nonlawyers in the midst and haste of a criminal investigation." Melson, 638 S.W.2d at 356-57 (internal quotation marks and citation omitted).

"In determining whether probable cause supports the issuance of a search warrant, reviewing courts may consider only the affidavit and may not consider other evidence provided to or known by the issuing magistrate or possessed by the affiant." Saine, 297 S.W.3d at 206 (citing Carter, 160 S.W.3d at 533). In examining an affidavit, this court is limited to determining "whether the issuing magistrate had 'a substantial basis for concluding that a search would uncover evidence of wrongdoing.'" Smotherman, 201 S.W.3d at 662 (quoting State v. Ballard, 836 S.W.2d 560, 562 (Tenn. 1992)).

**A. Nexus Between Criminal Activity and the Property to be Searched.** The Defendant-Appellant argues that the warrant authorizing the search of his property was invalid because the information in Trooper Boyd's affidavit lacked a sufficient nexus between the property to be searched and the suspected illegal drug activity. He claims that no facts outlined in the affidavit support Trooper Boyd's "bald assertion" in paragraph 51 of the affidavit that "intercepted phone calls and surveillance of [Christopher] Tuttle" established "that [Christopher] Tuttle utilized 4571 Dugger Road, Culleoka, Tennessee, on March 16, 2012 and April 2, 2012 to receive shipments of marijuana in excess of 100 pounds from Biato Jaramillo and Cleto Medina." He also claims that there were no details of any "intercepted phone calls" connecting Christopher Tuttle's purported drugs deals, Jaramillo, or Medina to 4571 Dugger Road. Moreover, he asserts that Christopher Tuttle's truck was only seen at his residence one time on March 16, 2012. Finally, the Defendant-Appellant claims that there was no evidence showing that Jaramillo, Medina, and their vehicles were seen or placed at his home, that any intercepted phone calls mentioned him or his address at 4571 Dugger Road, that any drugs were unloaded or loaded at his home, or that he was involved in any way in the alleged drug transactions.

"To establish probable cause, the affidavit must show a nexus among the criminal activity, the place to be searched, and the items to be seized." Saine, 297 S.W.3d at 206 (citing State v. Reid, 91 S.W.3d 247, 273 (Tenn. 2002); Smith, 868 S.W.2d at 572). In reviewing nexus, reviewing courts should "'consider whether the criminal activity under investigation was an isolated event or a protracted pattern of conduct[,] . . . the nature of the property sought, the normal inferences as to where a criminal would hide the evidence, and the perpetrator's opportunity to dispose of incriminating evidence.'" Saine, 297 S.W.3d at 206 (quoting Reid, 91 S.W.3d at 275).

At the suppression hearing, the Defendant-Appellant argued that Trooper Boyd's affidavit failed to establish probable cause for the magistrate to believe that evidence of any crime would be found at the Defendant-Appellant's residence or property located at 4571 Dugger Road. In the trial court's order denying the motion to suppress, it detailed the facts relative to the Defendant-Appellant's nexus argument and repeated the chronology of events as outlined in the affidavit. The trial court then determined that there were sufficient facts establishing probable cause for the issuance of a search warrant:

> In determining whether there is a sufficient nexus between the criminal activity and Defendants' home, the State argues that pursuant to the holding in State v. Saine, 297 S.W.3d 199 (Tenn. 2009), drug dealers ordinarily keep their drugs, the proceeds of drug sales and financial records relating to their business in their residences. There are two residences in the Affidavit for Christopher Tuttle, one at 302 Tampa Drive, Nashville, Tennessee and the other at 1126 Remuda Circle, Smyrna, Tennessee. The Affidavit does not state that Christopher Tuttle lives at 4571 Dugger Road in Culleoka, Tennessee.
>
> The 2000 marijuana charges and convictions placed Christopher Tuttle at [the Defendant-Appellant's] residence. The Court finds that the prior drug-trafficking history of [the Defendant-Appellant] and Christopher Tuttle in 2000 is properly set forth in the Affidavit for the issuing magistrate's consideration. However, beyond the mere history, all other statements concluding that this must be happening again, are mere conclusory allegations not supported by any facts. Mere conclusory allegations are insufficient to create probable cause. State v. Moon, 841 S.W.2d 336, 338 (Tenn. Crim. App. 1992).
>
> . . . .

The Court finds the following is sufficient to establish probable cause and sufficient to create a nexus to [the Defendant-Appellant's] property: the specifics of the intercepted phone calls and information from wire taps from Texas to Alabama to Tennessee, and information received from the investigation of a drug trafficking operation based in Texas, involving Christopher Tuttle; the surveillance of Medina and Biato traveling from Alabama to Tennessee and then to Columbia, exiting at 373 (Culleoka Highway), then meeting up with Christopher Tuttle; the Affiant's statement that he drove by [the Defendant-Appellant's] residence and located Christopher Tuttle's Nissan Titan there on the morning of March 16, 2012, after surveillance was unable to be maintained, then observed Christopher Tuttle pull onto Highway 373, then Highway 50 and onto I-65; the GPS ping of Medina's phone on April 2, 2012, placing him on Dugger Road; the fact that Affiant was familiar with the exact location of [the Defendant-Appellant's] residence through the 2000 investigation; and the fact that the exact location of [the Defendant-Appellant's] residence is correctly described with great particularity, despite the wrong GPS numerics.

In challenging probable cause supporting the search warrant, the Defendant-Appellant first argues that Adrian Davis's statement indicating that Christopher Tuttle's "whole family is involved in selling drugs" in paragraph 6 of the affidavit should not be considered in making the probable cause determination. He further contends Davis was of the criminal milieu and, therefore, not a reliable informant. See State v. Bishop, 431 S.W.3d 22, 38 (Tenn. 2014). We are compelled to note that the Defendant-Appellant did not challenge the reliability of the informant in the trial court. Therefore, technically, this issue has been waived. In any event, we will review this issue because probable cause was challenged in depth before the trial court. It is well-established that information given by a citizen informant carries a presumption of reliability. Id. However, when information is given "(1) by a professional informant who gives tips for money or favors, (2) by a person from the 'criminal milieu' who may have an ax to grind, or (3) by an anonymous informant, the information is presumptively suspect, and the State must establish its credibility." Id. (citing State v. Williams, 193 S.W.3d 502, 507-08 (Tenn. 2006); Carter, 160 S.W.3d at 534). In order for the State to establish the credibility of Adrian Davis, a criminal informant, it must satisfy the two-prong Aguilar–Spinelli test. See Jacumin, 778 S.W.2d at 436. When applying this test, "the magistrate must be informed of both (1) the basis for the informant's knowledge, and either (2)(a) a basis establishing the informant's credibility or (2)(b) a basis establishing that the informant's

information is reliable." Ballard, 836 S.W.2d at 562 (citation omitted). Probable cause may not be established until both prongs have been independently contemplated and satisfied. Id. (citation omitted). While the credibility of an informant's information may be supported by independent corroboration of its specifics, it is not necessary to corroborate every detail included in the informant's information or to directly connect the suspect to the commission of the criminal offense. Bishop, 431 S.W.3d at 38 (citing Jacumin, 778 S.W.2d at 432, 436; Melson, 638 S.W.2d at 355).

Here, we are inclined to agree with the Defendant-Appellant. The search warrant in this case was supported by a twelve page, single-spaced, typewritten affidavit. The listed name in the search warrant was Christopher Tuttle, and the corresponding target residence was listed as 4571 Dugger Rd., the Defendant-Appellant's residence. The affidavit also lists the Defendant-Appellant's surrounding property, which includes approximately six acres of rural land, as the area to be searched. This affidavit is replete with information supplied by Davis and corroborated by law enforcement. It provided more than sufficient probable cause to search the two residences of Christopher Tuttle. However, Davis did not provide law enforcement with any information linking Christopher Tuttle to the target residence. Davis also did not mention the Defendant-Appellant's name, that he (Davis) had observed the Defendant-Appellant involved in drug activity, or that any drug activity had previously occurred at the target residence.

Although Davis generally implicated Christopher Tuttle's "whole family" in a drug conspiracy, this statement required further development. Basic questions were left unanswered including which family members may have been involved, when this illegal drug activity by other family members occurred, and, most importantly, where the other family members committed the illegal drug activity. Without more, it is unreasonable to infer from Davis's general reference to Christopher Tuttle's "whole family" that he was referring to the Defendant-Appellant. Even if we were to make such a leap, there is simply nothing in the affidavit to connect the drug conspiracy identified by Davis to the target residence or the Defendant-Appellant. Based on the above facts and analysis, we conclude that Davis had no basis of knowledge that the Defendant-Appellant was involved with the target drug organization. We further conclude that Davis failed to identify the Defendant-Appellant in any meaningful way as a participant in criminal activity. Accordingly, we are unable to conclude that Davis was a reliable informant as it pertains to the search of the target residence.

We further conclude that there were no other facts included in the affidavit upon which a magistrate could reasonably infer that evidence of criminal activity, including but not limited to drugs, money, and guns, would be located inside the target residence.

-22-

Here, we acknowledge, as did the trial court, the two drug transactions alleged to have occurred on March 16, 2012, and April 2, 2012, and the telephone calls intercepted by DEA agents in Texas, Alabama, Georgia, and Tennessee regarding details of a drug trafficking operation involving Christopher Tuttle. We additionally acknowledge that (1) Christopher Tuttle's truck was seen at the target residence sometime after the first drug transaction was believed to have occurred; and (2) a GPS ping of Medina's cell phone placed Medina somewhere on the Defendant-Appellant's property sometime after the second drug transaction was believed to have occurred. These facts, however, fail to explain why evidence from the drug conspiracy would be found inside the target residence. They further fail to provide any direct evidence establishing that evidence of the drug conspiracy would be found inside the target residence.

Here, the State relies on Saine, 297 S.W.3d at 207, for the proposition that evidence of drug dealing would be found inside a drug dealer's home. In contrast to Saine, however, the affidavit in this case fails to provide any direct facts concerning the status of the Defendant-Appellant, his involvement in the drug conspiracy, or whether he was the owner/occupant of the target residence. The affidavit therefore failed to establish a substantial basis upon which a magistrate could conclude that evidence of drug operation would be found at the target residence. Accordingly, upon our de novo review, we conclude that the warrant for the search of the target residence and property failed to establish a sufficient nexus between the target residence and the drug conspiracy.

**B. Intentional Falsehoods within Affidavit.** The Defendant-Appellant next argues that paragraphs 18 and 37 of Trooper Boyd's affidavit contained false statements that were used to mislead the judge issuing the search warrant. Specifically, the last sentence in paragraph 18 stated, "As further described below Christopher TUTTLE used [the Defendant-Appellant's] residence on March 16, 2012 and April 2, 2012 to off load shipments of marijuana in the excess of 100 pounds." In reality, neither Trooper Boyd nor any other law enforcement agent observed people offloading marijuana at the Defendant-Appellant's residence or property, and he admitted that this statement was a "miswording" because he was "tired." To support his argument that this statement was either intentionally or recklessly made to deceive the issuing judge, the Defendant-Appellant points out that Trooper Boyd admitted that at the time he obtained the search warrant (1) he had no indication that any marijuana was left at 4571 Dugger Road; (2) that he believed the 4571 Dugger Road address was being used as only a "meet and exchange location" and (3) that he believed that the Defendant-Appellant's "residence, itself, wasn't used for anything."

The Defendant-Appellant also argues that Trooper Boyd's statement in paragraph 37 that Medina's phone was "pinged" on April 2, 2012, to GPS coordinates at the "same location" where Christopher Tuttle was found on March 16, 2012 is also false. He submits, and Trooper Boyd and Agent Steven agreed, that Medina's cell phone actually "pinged" to a location on a dirt road some 236 yards from the Defendant-Appellant's home, which was only 45 to 50 feet from a neighbor's home. He further asserts that Trooper Boyd's "misstatements leave the issuing magistrate with the impression that [the Defendant-Appellant's] residence—not the woods two-and-a-half football fields away— was the scene of a drug transaction." Citing State v. Little, 560 S.W.2d 403 (Tenn. 1978), the Defendant-Appellant argues that Trooper Boyd's intentionally false statements invalidate the search warrant. At the very least, he claims Trooper Boyd recklessly made these statements, which were essential to the probable cause determination, and that the remaining portions of the affidavit fail to establish probable cause.

In the order denying the motion to suppress, the trial court summarized the facts relevant to the Defendant-Appellant's claim of false statements:

> Paragraph 37, Page 8, states that a GPS ping from a cell phone places the conspirators on [the Defendant-Appellant's] property. Specific numeric are listed as coordinates for the GPS query. In addition, the Affidavit refers to surveillance of [the Defendant-Appellant's] property on March 16, 2012, establishing criminal activity there. This will be discussed later by the Court relative to Paragraph 18.

> [Defense] counsel called Ben Sellers with CTS, a GPS company. This witness was very knowledgeable. Mr. Sellers testified that the GPS location in the Affidavit is not the address of [the Defendant-Appellant's] property, but is actually a neighbor's address at 4585 Dugger Road. He testified that the neighbor's residence is approximately 140 yards from [the Defendant-Appellant's] residence. Mr. Sellers testified that his equipment has a high degree of reliability, stating "the strength of the signal indicates preciseness. Anything about a '4' is really good—our equipment is a '6.'" Mr. Sellers testified that he put in the coordinates and generated a map. The map designated 4585 Dugger Road. He then drove to the property to confirm the location. Mr. Sellers stated that to confirm accuracy, he pinged his device back to his server, then went online and got the same coordinates that are in the Affidavit.

Mr. Sellers testified that to further confirm his results, in addition to his equipment, he purchased two other devices that anyone can purchase, to test the coordinates in the Affidavit. These two devices also revealed 4585 Dugger Road as the GPS location according to the coordinates in the Affidavit.

During the hearing, the State's attorney pointed out to Mr. Sellers that a google search on his cell phone also confirmed the numeric in the Affidavit as 4571 Dugger Road. Mr. Sellers testified that a signal is not going to be 100% correct every time. He testified that several factors affect accuracy; including, trees, clouds, the time of the year and the quality of the GPS device. Based upon this testimony, the Court is inclined to grant some leniency relative to the GPS location of [the Defendant-Appellant's residence], and finds that the Affidavit otherwise describes with sufficient particularity the location of the residence and the property to be searched.

Paragraph 18, Page 5, states in part as follows: "As further described below Christopher Tuttle used this residence ([the Defendant-Appellant's residence] at 4571 Dugger Road) on March 16, 2012 and April 2, 2012 to off load shipments of marijuana in excess of 100 pounds." This statement is false. Affiant, Trooper Shawn Boyd, who has been assigned to the DEA Task Force since 2010, testified as follows: "I saw his (Christopher Tuttle['s]) truck only on March 16, 2012 in the driveway of the [Defendant-Appellant's] trailer—pulled in behind the trailer." Therefore, on that day only, March 16, 2012, he merely saw Christopher Tuttle's truck pulled in behind the trailer on the [Defendant-Appellant's] property. The Affidavit stated that further information would be included later as to criminal activity occurring on April 2, 2012 and March 16, 2012. There is nothing else in the Affidavit relative to these dates and specific criminal activity actually observed on [the Defendant-Appellant's] property. Trooper Boyd testified that this was a "simple mistake." There is nothing in the Affidavit and there is no testimony of any marijuana or other narcotics being delivered, loaded or off-loaded at 4571 Dugger Road.

As to paragraph 18 of the affidavit, the trial court found that although Trooper Boyd's statement that Christopher Tuttle used the Defendant-Appellant's residence to offload marijuana was false, it was not made with the intent to deceive the court. The court reasoned:

The Affidavit emphatically stated to the issuing magistrate that Christopher Tuttle used [the Defendant-Appellant's] residence on March 16, 2012 and April 2, 2012, to off-load shipments of marijuana in excess of 100 pounds. The Affidavit further stated that further details would follow. No details followed, and Trooper Boyd testified that no such off-loading of marijuana was observed on either day. The Court disagrees with Trooper Boyd that this was a "simple mistake."

The Court cannot say that Trooper Boyd made a false statement with intent to deceive the Court. Also, while the statement purports to help establish probable cause, and is a[n] important factor for the magistrate to consider as to probable cause, the Court cannot say it is a false statement "essential to the establishment of probable cause, recklessly made." The Court looks to other facts and statements in the Affidavit to establish probable cause, including what else happened on March 16, 2012 and April 2, 2012. In so doing, the Court finds the Affidavit is sufficient to create a nexus between the criminal activity and [the Defendant-Appellant's] property and to establish probable cause for the issuance of the Search Warrant.

A magistrate must rely on accurate information in making a probable cause determination. State v. Norris, 47 S.W.3d 457, 469 n.4 (Tenn. Crim. App. 2000). An affidavit containing false or misleading information may invalidate a search warrant. Little, 560 S.W.2d at 407; see Franks v. Delaware, 438 U.S. 154, 155-56 (1978) (holding that the fruits of a search shall be excluded when the affidavit supporting the search warrant includes intentionally false statements or recklessly false statements by the affiant that are necessary to the finding of probable cause). In Little, the Tennessee Supreme Court concluded:

[T]here are two circumstances that authorize the impeachment of an affidavit sufficient on its face, (1) a false statement made with intent to deceive the Court, whether material or immaterial to the issue of probable cause, and (2) a false statement, essential to the establishment of probable cause, recklessly made. Recklessness may be established by showing that a statement was false when made and that affiant did not have reasonable grounds for believing it, at that time.

Little, 560 S.W.2d at 407. "In order to be 'essential to the establishment of probable cause,' the false statement must be the only basis for probable cause or if not, the other

bases, standing alone, must not be sufficient to establish probable cause." Norris, 47 S.W.3d at 469 n.4 (citing State v. Tidmore, 604 S.W.2d 879, 882 (Tenn. Crim. App. 1980)).

Upon our review, we are unable to conclude that the statements in paragraphs 18 and 37 were not "essential to the establishment of probable cause, recklessly made." As an initial matter, the trial court did not provide its reasoning for concluding that the statements in question were not intentionally made with intent to deceive the court or recklessly made. In addition, the Defendant-Appellant correctly points out that the trial court did not determine whether the statement in paragraph 37 was false. As we understand the trial court's order on this issue, it did not give the accuracy of the GPS coordinates much weight because, regardless of the specific location, the GPS ping occurred somewhere on the Defendant-Appellant's property. However, this analysis misses the point. It further fails to acknowledge the erroneous placement of the ping, which was in the driveway of the Defendant-Appellant's residence, rather than hundreds of yards away. In any event, Agent Steven and Trooper Boyd testified that it would be false to state that the ping of Medina's phone from the second drug transaction occurred in the same place as the location of Christopher Tuttle's truck after the first transaction. Accordingly, we conclude that the Trooper Boyd's statement in paragraph 37, placing the second alleged drug transaction in the same place where Christopher Tuttle's truck was observed after the first transaction, was likewise false.

While the record does not show that these false statements were made intentionally, there is ample evidence demonstrating that they were recklessly made. "Recklessness may be established by showing that the statement was false when made and that the affiant did not have reasonable grounds for believing it, at that time." Little, 560 S.W.2d at 407. In regard to the statement in paragraph 18, that "the Defendant-Appellant's residence was being used to off load shipments of marijuana in excess of 100 pounds," Trooper Boyd candidly admitted that at the time he obtained the warrant he did not believe evidence of drugs would be found in the Defendant-Appellant's residence. He further stated that he "hoped" to find evidence of the homeowner's involvement in the drug conspiracy. He also knew at the time he obtained the warrant that no drug activity had been observed at or around the Defendant-Appellant's residence or property. In regard to the statement in paragraph 37, Trooper Boyd knew at the time he obtained the warrant that the GPS ping, indicating where the second drug transaction occurred, was not in the driveway of the Defendant-Appellant's residence or the same place where Christopher Tuttle was seen after the first drug transaction. Agent Steven, who provided Trooper Boyd with the GPS coordinates, further testified that he told Trooper Boyd that the Defendant-Appellant's property was within 41 meters of the GPS ping, but not the

-27-

Defendant-Appellant's residence. This statement is misleading because the issuing judge likely inferred that the second drug transaction occurred in front of the Defendant-Appellant's residence. These two statements were critical because, while tenuous at best, they were the only connection between the Defendant-Appellant's residence and the drug conspiracy. The preponderance of the evidence establishes that the inclusion of the false statements in paragraphs 18 and 37 were, in fact, recklessly made. We further conclude, based on the above facts, that Trooper Boyd did not have reasonable grounds for believing that the Defendant-Appellant's residence was used to load or offload shipments of marijuana as represented in the affidavit.

Next, we must determine whether these statements were essential to establishing probable cause. The trial court determined that the false statement in paragraph 18 was not essential to probable cause based on "other facts" as included in the trial court's order below:

> [T]he specifics of the intercepted phone calls and information from wire taps from Texas to Alabama to Tennessee, and information received from the investigation of a drug trafficking operation based in Texas, involving Christopher Tuttle; the surveillance of Medina and Biato traveling from Alabama to Tennessee and then to Columbia, exiting at 373 (Culleoka Highway), then meeting up with Christopher Tuttle; the Affiant's statement that he drove by [Defendant-Appellant's] residence and located Christopher Tuttle's Nissan Titan there on the morning of March 16, 2012, after surveillance was unable to be maintained, then observed Christopher Tuttle pull onto Highway 373, then Highway 50 and onto I-65; the GPS ping of Medina's phone on April 2, 2012, placing him on Dugger Road; the fact that Affiant was familiar with the exact location of Defendant's residence through the 2000 investigation, and the fact that the exact location of Defendant's residence is correctly described with great particularity, despite the wrong GPS numerics.

As previously noted, this search warrant was supported by a twelve page, single-spaced, type-written affidavit. We certainly understand the trial court's consideration of the above facts as included in the affidavit. There was an overwhelming amount of information supporting high level drug trafficking. However, none of that information linked any criminality to the Defendant-Appellant or the target address. Not including the historical references to the Defendant-Appellant's prior conviction, which the trial court properly determined to be relevant but not dispositive, the information provided to the issuing magistrate noted the Defendant-Appellant's address, the place to be searched,

-28-

twice: (1) "[Christopher Tuttle] used this residence to off load shipments of marijuana in excess of 100 pounds" (as used in paragraph 18) and (2) "[officers] drove by the residence . . . and located [Christopher Tuttle's truck] (as used in paragraph 19). Because the false statement was made in connection with the only criminal activity alleged to have occurred at the Defendant-Appellant's residence, there is no question that the issuing magistrate found it to be material. The GPS ping established Medina's location at the time of the alleged drug transaction somewhere on the Defendant-Appellant's property, but not at his residence, which was over 200 yards/feet away. The fact that Christopher Tuttle's truck was parked outside the Defendant-Appellant's residence fifteen to twenty minutes after the first drug transaction was alleged to have occurred, standing alone, is insufficient to establish probable cause to search the Defendant-Appellant's residence. Accordingly, absent these false statements, we are compelled to conclude that the affidavit did not contain sufficient probable cause.

**C. Staleness of Affidavit.** The Defendant-Appellant argues that the information in the affidavit was stale, and the search warrant therefore defective, because the time interval between the alleged criminal activity and the issuance of the warrant was too great. While the Defendant-Appellant acknowledges that the trial court's finding of ongoing criminal activity may be correct as to Medina and Christopher Tuttle, he argues that the facts in the affidavit do not support the court's finding of ongoing criminal activity at the Defendant-Appellant's home and property at 4571 Dugger Road. Noting Trooper Boyd's admission that 4571 Dugger Road was a "meet and exchange" location, the Defendant-Appellant argues there is nothing in the affidavit to make it probable that evidence of criminal activity would be found at 4571 Dugger Road approximately three weeks after April 2, 2012.

In its order denying the motion to suppress, the trial court outlined the facts relative to the Defendant-Appellant's argument that the affidavit was stale:

Subsequent to the surveillance on April 2, 2012, an authorized ping placed Christopher Tuttle at 1126 Remuda Circle, in Smyrna, Tennessee, on April 3, 2012. Surveillance was set up on April 4, 2012. (Paragraph 38 & 39, Page 8 & 9). On April 11, 2012, at 3:35 p.m. a phone call placed by Christopher Tuttle to Medina was intercepted. Christopher Tuttle told Medina he "just got thru and it was 157." Medina told Christopher Tuttle he would get credit for that. Christopher Tuttle responded: " . . . you know what I'm saying, cause that's supposed to be 170, that's what I give was 10 plus the three from last time so you know what I'm saying." (Paragraph 48, Pages 9 & 10).

-29-

Affiant applied for a Search Warrant on April 23, 2012, some 21 days from April 2, 2012. It is Defendant's position that any marijuana which might possibly be delivered to [the Defendant-Appellant's] residence on April 2, 2012, is no longer there. A GPS query, as well as surveillance places Christopher Tuttle in Smyrna on April 3, 2012, at 4:00 p.m. A GPS ping also places Christopher Tuttle in Smyrna in April 4, 2012, at 12:46 p.m.; however, surveillance could not confirm this until 1:30 p.m. Christopher Tuttle was last seen by surveillance at this address at 3:37 p[.]m. The next intercepted call is one to Medina from Christopher Tuttle on April 11, 2012.

The trial court then determined that the facts contained in Trooper Boyd's affidavit were not stale at the time of issuance of the search warrant:

The Affidavit in the instant case reveals criminal activity of a continuous nature, beginning with a traffic stop of Adrian Davis on March 2, 2012, in which he reveals knowledge of drug trafficking that involves Christopher Tuttle. There are two deliveries of marijuana to Tennessee. Christopher Tuttle claims the quantity is short, leading to assurances by Medina that he will receive credit with the next delivery. GPS does place Christopher Tuttle in Smyrna right after the April 2, 2012 delivery. While the intercepted phone call and GPS ping on April 11, 2012, places Christopher Tuttle in Smyrna, we do not know where the marijuana is and if it has been moved to a different location other than [the Defendant-Appellant's] property. Christopher Tuttle refers to "just (weighing)" the marijuana. He does not say where the marijuana that he just weighed is located. There is a gap of some seven days with no activity, from April 5 to April 11, 2012.

The Court finds that the criminal activity was of an on-going, continuous nature. Defendants have failed to carry their burden of proof that the facts are too stale to establish probable cause at the time the Search Warrant was issued.

In order for the establishment of probable cause, an affidavit "must set forth facts from which a reasonable conclusion might be drawn that the evidence is in the place to be searched." Smith, 868 S.W.2d at 572. Consequently, the affidavit must allege facts that the contraband sought to be seized or the illegal activity at issue exists at the time the

-30-

search warrant is to be issued. Norris, 47 S.W.3d at 470 (citing State v. Curtis, 964 S.W.2d 604, 616 (Tenn. Crim. App. 1997)). Therefore, "'[i]t is necessary for a finding of probable cause that the time interval between the alleged criminal activity and the issuance of a warrant not be too great.'" State v. Archibald, 334 S.W.3d 212, 215 (Tenn. Crim. App. 2010) (quoting State v. Baron, 659 S.W.2d 811, 814 (Tenn. Crim. App. 1983)). A determination regarding staleness must be made on a case-by-case basis. Norris, 47 S.W.3d at 470 (citing State v. Meeks, 876 S.W.2d 121, 124 (Tenn. Crim. App. 1993)).

When the illegal activity described is ongoing or continuous, courts have generally concluded that the affidavit does not become stale with the passage of time. State v. Hayes, 337 S.W.3d 235, 259 (Tenn. Crim. App. 2010) (citing State v. Stepherson, 15 S.W.3d 898, 903 (Tenn. Crim. App. 1999); State v. Thomas, 818 S.W.2d 350, 357 (Tenn. Crim. App. 1991)). This court has held that the sale of drugs, under certain circumstances, can be an ongoing activity. Hayes, 337 S.W.3d at 259 (citing State v. Conatser, 958 S.W.2d 357, 361 (Tenn. Crim. App. 1997) (concluding that continuous contact and references to ongoing illegal drug activity between the defendant and a person involved in the drug operation was sufficient to create a nexus between the criminal activity and the search of the defendant's home that was not stale)). Here, the affidavit contained multiple references to an ongoing drug trafficking operation. However, as previously discussed, none of this information established a link between the illegal drug conspiracy and the target residence. Accordingly, because we have determined that there was no drug activity observed in or around the Defendant-Appellant's residence or property, this issue is moot.

Because the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking. Accordingly, we are compelled to conclude that the Defendant-Appellant's convictions in this case must be reversed.

**II. Sufficiency of the Evidence.** The Defendant-Appellant also argues that the evidence presented at trial was insufficient to sustain his convictions for conspiracy to possess marijuana in an amount over 300 pounds with intent to sell or deliver and conspiracy to commit money laundering. He claims the State failed to prove that he knew about the drug operation, which was a necessary prerequisite to finding that he was a part of the conspiracy to possess marijuana and the conspiracy to commit money laundering. For the reasons that follow, we conclude as a matter of law that there was insufficient evidence to establish both conspiracy offenses in this case.

When considering the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence.  State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).  "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict."  State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009).  When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt."

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two.  State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).  The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'"  State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275).  The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence.  State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)).  Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury.  Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)).  When considering the sufficiency of the evidence, this court shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact.  Id.

"The essence of a conspiracy is an agreement to accomplish a criminal or unlawful act."  State v. Hodgkinson, 778 S.W.2d 54, 58 (Tenn. Crim. App. 1989) (citing Owens v. State, 84 Tenn. 1, 3 (1885)).  While a conspiracy requires a knowing involvement, a formal or expressed agreement is unnecessary, and the agreement may be proven by circumstantial evidence.  State v. Shropshire, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993).  "'Conspiracy implies concert of design and not participation in every detail of execution.'"  Id. at 641 (quoting Randolph v. State, 570 S.W.2d 869, 871 (Tenn. Crim.

App. 1978)).  The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense.  T. C. A. §39-12-103(a).  The State is also required to prove that the defendant or one with whom the defendant conspired performed an overt act in pursuance of the conspiracy.  T.C.A. § 39-12-103(d).

**A.  <u>Conspiracy to Possess Marijuana.</u>**  The Defendant-Appellant argues the evidence was insufficient to sustain his conviction for conspiracy to possess over 300 pounds of marijuana with the intent to sell or deliver.  He submits no one observed him during the March 16, 2012 or April 2, 2012 drug transactions, no drugs were seen unloaded at his home, no cellphones, drug ledgers, or documents connected him to drug operation, and Medina and Jaramillo were never seen at his home.  He also asserts that although Christopher Tuttle's car was seen at his home for a short period of time on March 16, 2012, it was never seen at his home on April 2, 2012.  In addition, he argues that the two other drug deliveries to Christopher Tuttle occurred nowhere near his 4571 Dugger Road address.  Finally, he claims that the money seized from Christopher Tuttle's home in Smyrna was not in pre-2000 bills as was the money at his home and that the marijuana at his home was packaged differently than the marijuana at Christopher Tuttle's home.

We have scoured the record in this case.  It is devoid of any conspiratorial conduct between the Defendant-Appellant and his son.  There was no proof demonstrating the Defendant-Appellant's knowing involvement in the conspiracy, as alleged in the indictment.  The State's theory of this case was that the Defendant-Appellant allowed his son, Christopher Tuttle, to use his residence to meet a drug supplier and pick up loads of marijuana.  Acknowledging that there is no direct proof of its theory, the State argues in its brief that the circumstantial evidence legitimately showed that the Defendant-Appellant conspired with his son to possess marijuana with intent to sell it.  We disagree.  The bulk of the proof in this case concerned Christopher Tuttle and his involvement in a drug conspiracy.  Although one of the drug suppliers, Medina, testified that he conducted the April 2, 2012 drug transaction on the Defendant-Appellant's property, he also testified that he had never met or communicated with the Defendant-Appellant.  Medina also agreed that he was involved with at least two other drug transactions with Christopher Tuttle, which were not conducted on the Defendant-Appellant's property.  There was no other testimony concerning the Defendant-Appellant or illegal drug activity at the Defendant-Appellant's residence.  A single drug transaction that occurred on the Defendant-Appellant's rural-six-acre plot of land is insufficient to establish either (1) an

-33-

overt act on behalf of the Defendant-Appellant in furtherance of his son's drug conspiracy; or (2) that the Defendant-Appellant was knowingly involved in his son's drug conspiracy.

Next, the State infers from the amount of marijuana that was seized from the Defendant-Appellant's home and the way in which it was packaged that the Defendant-Appellant was knowingly involved or agreed to participate in his son's drug conspiracy. The State devoted a substantial amount of time at trial detailing the items that were recovered during the search warrant. We acknowledge that the marijuana found at the Defendant-Appellant's residence had "similar packaging and pressing techniques" as the marijuana found at Christopher Tuttle's home in Smyrna. We further acknowledge that scales, a large amount of money, a money counting machine, a marijuana grinder, and guns were found in the Defendant-Appellant's home. Taken in the light most favorable to the State, this evidence establishes that the Defendant-Appellant had committed drug-related crimes. However, it is "too thin a reed to establish the essential elements of a conspiracy-the agreement." United States v. Gore, 153 F.3d 34, 41 (2d Cir. 1998). It does not demonstrate that the Defendant-Appellant expressly or tacitly agreed to participate in the conspiracy as alleged in the indictment. To convict the Defendant-Appellant of conspiracy based on the above circumstantial evidence as the State suggests, the jury would be permitted to draw inference of an agreement without providing a logical and convincing connection between the facts established and the conclusion inferred. Id. (citing United States v. Salmon, 944 F.2d 1106, 1114 (3d Cir. 1991)). To force a jury to pile inference upon inference is a practice which has long been held to be improper. Direct Sales Co. v. United States, 319 U.S. 703, 711, 63 S.Ct. 1265 (1943).

Because the proof in this case amounts to no more than reasonable speculation, rather than sufficient evidence, the Defendant-Appellant's conspiracy conviction cannot stand. See Newman v. Metrish, 543 F.3d 793, 796 (6th Cir. 2008) (noting that "there are times when circumstantial evidence 'amounts to only a reasonable speculation and not to sufficient evidence'"); United States v. White, 932 F.2d 588, 590 (6th Cir.1991) (holding that "a line must be drawn between valid circumstantial evidence, and evidence which requires a leap of faith in order to support a conviction"). We therefore hold that no rational trier of fact could find the Defendant-Appellant guilty beyond a reasonable doubt of each element of the drug conspiracy, as alleged in the indictment.

**B. Conspiracy to Launder Money.** The Defendant-Appellant also contends that the evidence is insufficient to sustain his conviction for conspiracy to launder money.[2]

---

[2] The Defendant-Appellant concedes in his brief that the evidence supporting the convictions for possession of a schedule IV controlled substance for resale and money laundering is sufficient.

The State argues there was sufficient evidence to support the convictions of conspiracy to commit money laundering based on the $1,098,050 found throughout the Defendant-Appellant's property, which they suggest was either proceeds from or facilitation of Christopher Tuttle's drug conspiracy. We disagree.

The indictment in this case specifically charged that the Defendant-Appellant, along with other co-conspirators, "knowingly conspire[d] . . . and acting for the purpose of promoting or facilitating the commission of the offense, to wit: money laundering, to use proceeds derived directly or indirectly from a specified unlawful activity, to wit: the felonious sale of marijuana, to conduct a financial transaction . . . to wit: the burial of U.S. Currency in the amount of $1,000,000.00, or less . . . with intent to conceal or disguise the nature, location source, ownership or control of the criminally derived proceeds[.]"

A money laundering conspiracy requires the State to prove that the Defendant-Appellant entered into an agreement with another to "knowingly use or conspire to use . . . proceeds derived directly or indirectly from a specified unlawful activity . . . with the intent to conceal or disguise the nature, location [or] source . . . of the criminally derived proceeds." T.C.A. §39-14-903(a)(1). Here, the State's theory was that the Defendant-Appellant and his wife knowingly entered into an agreement with his son to allow his property to be used to bury the financial proceeds from his son's drug trafficking activities. In support of their theory, the State asserts that $1,098,050 was found in different parts of the Defendant-Appellant's property, even though the Defendant-Appellant's wife, who was the breadwinner for the household made approximately $15,000 a year and the Defendant-Appellant earned, at most, $1,613 a year. We acknowledge the disparity in the Defendant-Appellant's income and the money seized from his home. However, "evidence of money-laundering alone is not sufficient to link a person who launders money with a conspiracy to violate narcotics laws." United States v. Todd, 920 F.2d 399, 406 (6th Cir.1990). The State's argument must fail for several reasons. First, as we noted in the above section concerning conspiracy, in order to sustain a conviction for conspiracy as alleged in the indictment, the State had to prove that the Defendant-Appellant was aware of and agreed to participate in his son's drug trafficking organization. We have already concluded that the record fails to establish such an agreement. The State also ignores the fact that **all** of the money seized from the Defendant-Appellant's home was minted prior to 2000, which means that it was more than likely obtained prior to the drug conspiracy as alleged in the indictment. Accordingly, the Defendant-Appellant's conspiracy to launder money conviction must also be reversed and vacated.

-35-

**III. Compliance with Forfeiture Statutes.** As an initial matter, none of the Defendant-Appellant's remaining convictions, namely, simple possession of cocaine, possession of not more than 10 pounds of marijuana with intent to sell, or possession of a firearm with the intent to go armed during the commission of a dangerous felony, appear to qualify as convictions from which criminal proceeds are subject to forfeiture. T.C.A. §39-11-703(b)(1). Were we concerned merely with the Defendant-Appellant's current offenses as predicates for forfeiture, we would vacate the forfeiture order on this ground alone. However, the Defendant-Appellant was convicted of predicate offenses in 2002, and accordingly, we will address the Defendant-Appellant's challenges to the trial court's forfeiture order in detail.[3] The Defendant-Appellant contends that the forfeiture of his $1,098,050 in cash violated the forfeiture statutes outlined in Tennessee Code Annotated sections 39-11-701 to -717, thereby entitling him to the return of these funds.[4] He asserts the money seized was obtained by him more than five years prior to the seizure, therefore falling outside the five-year statute of limitations in the forfeiture statute. He also argues that the seizure of this money was invalid because Detective Rowney failed to deliver a notice of seizure regarding these funds on the day the funds were seized.

"Forfeiture is defined as '[t]he divestiture of property without compensation.'" State v. Sprunger, --- S.W.3d ----, 2015 WL 1058222, at *8 (Tenn. Mar. 8, 2015) (quoting Black's Law Dictionary 722 (9th ed. 2009) (Forfeiture)). In this case, as in Sprunger, the divestiture of the $1,098,050 in cash to the State of Tennessee following a forfeiture hearing occurred because the Defendant-Appellant committed criminal offenses. Id. The United States Supreme Court and the Tennessee Supreme Court have "clarif[ied] that forfeiture actions are in rem, regarding the property" and although "they proceed parallel to criminal prosecutions and are 'based upon the same underlying events,' they are civil in nature." Id. (quoting United States v. Ursery, 518 U.S. 267, 274 (1996)) (citing Stuart v. State Dep't of Safety, 963 S.W.2d 28, 34 (Tenn. 1998)). Because forfeiture proceedings are civil in nature, the State has the less onerous burden of proof by a preponderance of the evidence that the property is subject to forfeiture rather than the State's burden in criminal proceedings of proof beyond a reasonable doubt. Id. (citing Stuart, 963 S.W.2d at 33). While civil forfeiture has some punitive overtones, it has several non-punitive purposes which include encouraging property owners to stop use of their property for illegal purposes, halting nuisances, preventing

---

[3] This chapter of the Code is intended to supplement other forfeiture laws. It "is remedial and shall be liberally construed to effect its purpose. This part shall apply retroactively to all proceeds acquired or received prior to June 27, 1998, if the conduct giving rise to forfeiture constituted a criminal offense at the time of the acquisition of the property." See T.C.A. § 39-11-717.

[4] There were several other items ordered to be forfeited in this case; however, the Defendant-Appellant challenges only the forfeiture of the money.

continued illicit use of a forfeited property, and making illegal acts unprofitable. <u>Id.</u> (citing <u>Ursery</u>, 518 U.S. at 290; <u>Stuart</u>, 963 S.W.2d at 33-34).

It is "the item that is the subject of the forfeiture proceeding; the 'offender' and the 'claimant' is the owner, or perhaps only a possessor, of the item in question." <u>Various Items of Personal Property v. United States</u>, 282 U.S. 577, 581, 51 S.Ct. 282 (1931). To be clear:

> It is the property which is proceeded against, and, by resort to a legal fiction, held guilty and condemned as though it were conscious instead of inanimate and insentient. In a criminal prosecution it is the wrongdoer in person who is proceeded against, convicted and punished. The forfeiture is no part of the punishment for the criminal offense.

<u>Id.</u> (quoting <u>Origet v. United States</u>, 125 U.S. 240, 245-247 (1888)).

Because the forfeiture proceedings in this case were heard by the trial court in a bench trial, we apply the standard of review applicable to appellate review of a bench trial pursuant to Rule 13(d) of the Tennessee Rules of Appellate Procedure, which states that we must review a trial court's findings of fact de novo on the record with a presumption of correctness and that we must review a trial court's conclusions of law de novo with no presumption of correctness. <u>See</u> Tenn. R. App. P. 13(d); <u>Sprunger</u>, --- S.W.3d ----, 2015 WL 1058222, at *13 n.26.

Tennessee Code Annotated section 39-11-701 clearly outlines the legislative intent for the group of forfeiture statutes pertaining to this case, declaring "that an effective means of deterring criminal acts committed for financial gain is through the forfeiture of profits and proceeds acquired and accumulated as a result of such criminal activities." T.C.A. § 39-11-701(a) (2010). It asserts that "all property acquired and accumulated as a result of criminal offenses be forfeited to the state of Tennessee, and that the proceeds be used to fund further law enforcement efforts in this state." <u>Id.</u> § 39-11-701(b) (2010). Tennessee Code Annotated section 39-11-703 allows the judicial forfeiture of "[a]ny property, real or personal, directly or indirectly <u>acquired by or received in violation of any statute or as an inducement to violate any statute, or any property traceable to the proceeds from the violation</u>[.]" <u>Id.</u> § 39-11-703(a) (Supp. 2011) (emphasis added).

**A. Five Year Statute of Limitations.** The Defendant-Appellant claims the money seized was obtained by him more than five years prior to the seizure, therefore falling outside the five-year statute of limitations in the forfeiture statute. He claims there is no proof that "the $1,098,050 in old bills was 'acquired by or received in violation of

any statute' . . . within the five years preceding the date of the indictment (December 3, 2012)." He further claims there is no proof that "the pre-2000 cash was 'an instrumentality in or used in furtherance of' any of the enumerated crimes of T.C.A. § 39-11-703(b)." The Defendant-Appellant argues that "there is not one shred of evidence from which the trial court could conclude that the $1,098,050 in pre-2000 bills had been used in the 'now on-going drug operation'" and asserts that "the fact that [this money] was 'going to be used' in furtherance of the now on-going drug operation" does not render it subject to forfeiture.

As support, the Defendant-Appellant claims the record shows the seized money was earned, whether legally or illegally, prior to the year 2000 and then buried or concealed for many years. He challenges the State's argument, which was that the money, which had been earned in 1998, 1999, and 2000, was being used in 2012 because the conspiracy between Christopher Tuttle and the Defendant-Appellant did not terminate and was merely "put on hold after their arrests, convictions, and incarcerations for their illegal activities in 2000." The Defendant-Appellant claims that because Christopher Tuttle's and the Defendant-Appellant's prior convictions included convictions for conspiracy to distribute marijuana, conspiracy to commit money laundering, and money laundering, the principles of double jeopardy preclude forfeiture of property related to those prior convictions.

The State contends that the trial court properly determined that the preponderance of the evidence established the seized money was being used in furtherance of the drug operation spearheaded by Christopher Tuttle and Medina. The State did not address the Defendant-Appellant's double jeopardy claim.

At the pre-trial hearing on the motion to dismiss the forfeiture count of the indictment, the State argued that money, which was earned sometime between 1998 and 2000, was "still in play" when it was dug up for use in the 2012 drug conspiracy. It argued that approximately one million dollars in the ammunition can in the trunk of the Civic could not have been used to cover legitimate expenses given the thousands of dollars found inside the Defendant-Appellant's residence. The State's theory was that the conspiracy between Christopher Tuttle and his father, the Defendant-Appellant, did not end in 2000 when they were arrested, convicted, and served their prison terms; instead, the conspiracy was merely "put on hold" when Christopher Tuttle and the Defendant-Appellant went to prison. It further argued that the conduct never terminated because less than a year after Christopher Tuttle was released from prison, he was using this money to purchase hundreds of pounds of marijuana, was using the Defendant-Appellant's property for some of the drug transactions, and was storing the proceeds from

-38-

the drug sales at the Defendant-Appellant's house and property, just as he was doing in 2000. The State made similar arguments at the post-trial forfeiture hearing.

The evidence from the trial showed that of the total $1,098,050 seized from the Defendant-Appellant's property, $1,000,300 was found in a dirt-covered ammunition can in the trunk of a Honda Civic in the front yard, $20,000 to $22,000 was found in the Defendant-Appellant's closet, and $75,000 was found in a bedroom dresser. At the pre-trial motion regarding the dismissal of the forfeiture count and at trial, Detective Rowney testified that because all of the bills comprising the $1,098,050 had been issued prior to the year 2000, he concluded that this money had been buried or concealed for the last twelve years. He also stated that the rubber bands bundling the cash in the ammunition can had melted onto the money. Nevertheless, Detective Rowney acknowledged that a person could remove cash, a portion at a time, and spend it without putting newer money with it.

After the conclusion of the forfeiture hearing, the court held that the $1,098,050 seized from 4571 Dugger Road was forfeited to the State of Tennessee. The trial court reasoned as follows:

> Tenn. Code Ann. [§] 39-11-708(d) states that the criminal forfeiture action shall be charged within five years after the conduct giving rise to forfeiture terminates[.] It is undisputed that the bills seized totaling $1,098,050 were minted prior to 2000. Both [the Defendant-Appellant] and Christopher Tuttle were charged with a drug conspiracy in 2000 and convicted in 2002 and 2003. The money was hidden or buried for over 12 years when it was dug up and found at [the Defendant-Appellant's] residence. The Court finds that since the money had been dug up after so long, it is reasonable that the money was either used, or going to be used, in furtherance of the now on-going drug operation. The evidence establishes that the money seized is subject to forfeiture.

Tennessee Code Annotated section 39-11-708 outlines the procedure for judicial forfeiture of property:

> <u>The state must establish by a preponderance of the evidence that the property is subject to forfeiture under this part</u> and that one (1) or more acts described in § 39-11-703 giving rise to forfeiture occurred after June 27, 1998, regardless of when the property was originally acquired, as long as the defendant's interest in the property was acquired or appreciated

following the commission of an act giving rise to forfeiture. As soon as practicable after entering a guilty verdict or accepting a plea of guilty or nolo contendere on any count in an indictment, presentment, or information with regard to which criminal forfeiture is sought, the court shall determine whether the state has established that the property is subject to forfeiture. The court's determination may be based on evidence already in the record, including any written plea agreement, or if forfeiture is contested on evidence or information presented by the parties at a sentencing hearing. Upon the request by the state or the defendant in a case in which a jury returns a verdict of guilty, the jury shall determine in a bifurcated hearing whether the state has established that the property is subject to forfeiture. The state and defendant may introduce evidence at the forfeiture hearing. If the jury or court finds that the state has met its burden of proof from all the evidence in the case, then each property determined to be subject to forfeiture shall be designated in a special verdict and forfeited in accordance with this part. <u>The criminal forfeiture action shall be charged within five (5) years after the conduct giving rise to forfeiture terminates.</u>

<u>Id.</u> § 39-11-708(d) (2010) (emphasis added) (amended April 16, 2015).

"'The purpose of a statute of limitations is to protect a defendant against delay and the use of stale evidence and to provide an incentive for efficient prosecutorial action in criminal cases.'" <u>State v. Ferrante</u>, 269 S.W.3d 908, 911 (Tenn. 2008) (quoting <u>State v. Nielsen</u>, 44 S.W.3d 496, 499 (Tenn. 2001)). Appellate courts must construe statutes of limitations liberally in favor of the criminally accused. <u>Id.</u> (citing <u>State v. Henry</u>, 834 S.W.2d 273, 276 (Tenn. 1992)).

We are unpersuaded by the State's arguments and the trial court's finding that the money was subject to forfeiture because it was buried following the 2002 conspiracy between the Defendant-Appellant and his son, and that the Defendant-Appellant dug it up when his son was released from prison in 2011; therefore, the State claims the 2002 conspiracy never ceased between the Defendant-Appellant and his son. It is unreasonable to conclude that the 2002 conspiracy between the Defendant-Appellant and his son continued during his eleven-year period of incarceration. Additionally, there was simply no proof offered to support such a theory at the hearing, nor was there any proof to establish that the money was being used or going to be used in furtherance of Christopher Tuttle's 2012 drug operation. Moreover, the statutory language does not provide for the forfeiture of property based on its intended use. Although we reject the above reasoning as implausible, we conclude that the Defendant-Appellant's conduct

-40-

from his prior 2002 conviction is an alternative ground upon which the State was entitled to seize the money.

The Defendant-Appellant argues, without elaboration or citation, that the forfeiture proceeding instituted against him in this case violated principles of double jeopardy because he previously pleaded guilty to the 2002 conspiracy offense. We disagree. As previously discussed, civil forfeitures are not criminal punishments; thus, double jeopardy protections do not apply. See Stuart v. State, 963 S.W.2d 28, 34 (Tenn.1998) (holding judicial forfeiture statutes do not violate double jeopardy); see also United States v. Various Tracts of Land in Muskogee and Cherokee Counties, 98 F.3d 1350 (10th Cir. 1996) (citing United States v. D.K.G. Appaloosas, Inc., 829 F.2d 532, 540-45 (5th Cir.1987); United States v. Ursery, 116 S.Ct. 2135, 2149 (1996) (holding that civil in rem forfeitures pursuant to federal forfeiture statute are neither punishment nor criminal for double jeopardy purposes)).

The primary issue then becomes whether the State instituted its forfeiture proceedings to seize the money within five years after the conduct giving rise to forfeiture, i.e. the factual basis supporting his 2002 guilty pleas to conspiracy to commit money laundering and possession of drugs with intent to distribute, terminated. Obviously, because the money was hidden or buried, it did not. The five-year statute of limitations period in Tennessee's general forfeiture statute does not contain a tolling provision or any exceptions for fraud or concealment. Nevertheless, under limited and rare circumstances, a statute of limitations may be tolled based on equitable principles. Holmberg v. Armbrecht, 327 U.S. 392, 397, 66 S.Ct. 582 (1946) (holding that limitations periods are subject to equitable tolling where tolling is not inconsistent with the statute); United States v. Beggerly, 524 U.S. 38, 48, 118 S.Ct. 1862 (1998); see also Graham-Humphreys v. Memphis Brooks Museum of Art, Inc., 209 F.3d 552, 561 (6th Cir.2000) (finding that federal courts "sparingly bestow" equitable tolling). "Equitable tolling is applicable to statutes of limitations because their main thrust is to encourage the plaintiff to 'pursue his rights diligently,' and when an 'extraordinary circumstance prevents him from bringing a timely action,' the restriction imposed by the statute of limitations does not further the statute's purpose." CTS Corp. v. Waldburger, 134 S. Ct. 2175 (2014). Equitable tolling will not aid claimants who, through their own negligence, fail to preserve their legal rights. Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990). "[T]he propriety of equitable tolling must necessarily be determined on a case-by-case basis." Graham-Humphreys, 209 F.3d at 561.

In consideration of this issue, we acknowledge that the State convicted the Defendant-Appellant in 2002 for similar offenses as the case sub judice. The 2002

-41-

conspiracy indictment listed his overt act as "hiding" and "accumulating" the proceeds from the 2002 conspiracy. Based on his overt acts, and because the defendant property was minted prior to 2002 and found in a dirt-covered ammo can, it is conceivable that the Defendant-Appellant accumulated and concealed the defendant property from the 2002 offense. This evidence demonstrates that the State was unable to pursue this claim in a timely manner through no fault of their own. See e.g. United States v. All Funds Distributed to or o/b/o Weiss, 345 F.3d 49, 54 (2nd Cir. 2003)(equitably tolled statute of limitations where government was unable to institute judicial forfeiture proceedings within the limitations period because ERISA anti-alienation provisions prevented disbursement of defendant funds). Moreover, strict adherence to the statute of limitations in this case would defeat the legislative intent and overall purpose of the forfeiture statute. Thus, we believe these circumstances present one of those rare situations in which the interests of justice demand equitable relief. See e.g. United States v. Midgley, 142 F.3d 174, 179 (3d Cir.1998). Accordingly, we conclude that the Defendant-Appellant's concealment of the proceeds from his 2002 conspiracy convictions tolled the applicable limitations period.

Next, we must determine whether the State established by a preponderance of the evidence that the defendant property was subject to forfeiture. At the outset of this analysis, we are compelled to note that an unconstitutional search or seizure does not preclude forfeiture of the seized property. Fuqua v. Armour, 543 S.W.2d 64, 68 (Tenn. 1976). In Fuqua, the Tennessee Supreme Court held that an unlawful seizure of an automobile did not prevent forfeiture of the same. It reasoned:

> A forfeiture proceeding such as this is an action In rem and jurisdiction of the Court depends upon its actual or constructive custody of the property being forfeited, ordinarily acquired by virtue of its previous seizure. And, it has been held many times that the fact that the seizure was unlawful does not affect the jurisdiction of the court to proceed in a forfeiture action or in any way prevent the court from rendering a valid decree of forfeiture, provided grounds for forfeiture are established.

Id. (citations omitted). Moreover, the forfeiture statute permits the forfeiture of "any property . . . directly or indirectly acquired by or received in violation of any statute[.]"

The State put on proof at the hearing of the circumstances surrounding the Defendant-Appellant's 2002 conspiracy convictions. Specifically, the Defendant-Appellant "facilitated the distribution of the proceeds and conspiracy by hiding said proceeds and acquiring property from said proceeds[.]" During the seizure from that

-42-

conviction, $112,000 dollars was recovered from the Defendant-Appellant's property in an "ammo can," with the notation "200" and the initials "C.T." on it. Although he was unable to confirm it, the officer conducting that seizure agreed that they had information that more money was hidden on the Defendant-Appellant's property. There was also no evidence of a legitimate source from which the money was obtained. Accordingly, we conclude, as in Fuqua, that the forfeiture is supported by a preponderance of the evidence in spite of the illegal search.

**B. Notice of Seizure.** Second, the Defendant-Appellant claims that the seizure of the $1,098,050 was invalid because Detective Rowney failed to deliver a notice of seizure regarding these funds on the day the funds were seized. He asserts that the eventual delivery of the notice of seizure by certified mail failed to satisfy the requirement in Code section 39-11-707(b) that the notice of seizure be delivered to the possessor or owner "upon seizure of personal property."

The Tennessee Supreme Court has stressed that due process principles prohibit the forfeiture of property without providing adequate notice to those with an interest in the property:

> One of the basic constitutional guarantees, procedural due process under the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Section 8 of the Tennessee Constitution, prohibit the forfeiture of private property without first providing those with an interest in the property to a hearing held at a reasonable time and in a meaningful manner. Notice must be given in a manner reasonably calculated to notify all interested parties of the pending forfeiture of the property in order to afford the opportunity to object to the State's taking. One of the essential elements of due process in the confiscation and forfeiture of private property is adequate notice to all interested parties.

Redd v. Tenn. Dept. of Safety, 895 S.W.2d 322, 334-35 (citations omitted). It is well recognized that forfeitures are not favored by the law. Sprunger, 2015 WL 1058222, at *9 (citing Redd, 895 S.W.2d at 335; Wells v. McCanless, 198 S.W.2d 641, 643 (Tenn. 1947)). Therefore, forfeiture statutes are to be strictly construed. Id. (citations omitted); see Wells, 198 S.W.2d at 643.

Although recent Tennessee decisions have excused the State's failure to comply with the procedural requirements for civil forfeiture, see Watson v. Tenn. Dept. of Safety, 361 S.W.3d 549, 556-57 (Tenn. Ct. App. 2011); Garrett v. State, 717 S.W.2d 290, 292

(Tenn. 1986); <u>Charles A. Harmon v. James J.J. Jones</u>, No. E2010-02500-COA-R3-CV, 2012 WL 3291792, at *10 (Tenn. Ct. App. Aug. 14, 2012), the Tennessee Supreme Court in <u>Sprunger</u> clarified that the State must present affirmative proof that it has complied with the procedural and substantive requirements outlined in the forfeiture statutes:

> In light of these principles, we hold that, in forfeiture proceedings, the governmental authority seeking forfeiture must present affirmative proof that it has complied with both the procedural and the substantive requirements in the forfeiture statutes enacted by our Legislature. Consistent with the civil nature of forfeiture proceedings, the State's burden of proof as to both the procedural and substantive statutory requirements is by a preponderance of the evidence. <u>Stuart</u>, 963 S.W.2d at 33.
> . . . .
>
> As noted above: "Statutes authorizing forfeitures are to be strictly construed." <u>Redd</u>, 895 S.W.2d at 335; <u>see also</u> <u>Garrett</u>, 717 S.W.2d at 291; <u>Wells</u>, 198 S.W.2d at 643. This directive applies to both the substantive and the procedural provisions of the forfeiture statutes. Strict construction of the procedural as well as the substantive provisions aligns with the Tennessee Constitution's disfavor for forfeiture and serves "to safeguard the due process rights of citizens." <u>Redd</u>, 895 S.W.2d at 335. "'Forfeitures . . . should be enforced only when [they are] within both [the] letter and spirit of the law.'" <u>Wells</u>, 198 S.W.2d at 643 (quoting <u>United States v. One 1936 Model Ford V-8</u>, 307 U.S. 219, 59 S.Ct. 861, 865, 83 L.Ed. 1249 (1939)).

<u>Sprunger</u>, --- S.W.3d ----, 2015 WL 1058222, at *14-15. However, the <u>Sprunger</u> court recognized that "courts must refrain from construing 'any statute, including a confiscation statute, so strictly that we negate the intentions of the legislators who passed the law.'" <u>Id.</u> at *15 n.27 (quoting <u>Garrett</u>, 717 S.W.2d at 291).

In evaluating the sufficiency of the service of notice in this case, we note that federal courts have held consistently that due process requirements were satisfied by the sending of notices of seizure or notices of forfeiture proceedings by certified mail. <u>See</u> <u>Dusenbery v. United States</u>, 534 U.S. 161, 170-73 (2002) (holding that the forwarding of the notice of forfeiture, similar in nature to the notice of seizure in this case, by certified mail to the federal prison where the claimant was incarcerated, to the address of the residence where the claimant was arrested, and to the address for the claimant's mother satisfied due process requirements because such efforts were reasonably calculated to

-44-

apprise the claimant of the pendency of the action and because the Due Process Clause does not require "heroic efforts by the Government" to ensure delivery); see also Whiting v. United States, 231 F.3d 70, 76-77 (1st Cir. 2000) (Government's sending of notice of pending civil forfeiture of real property by certified mail to an inmate at his prison facility, absent proof that the mail delivery was unreliable, satisfied due process); United States v. Real Property, 135 F.3d 1312, 1316 (9th Cir. 1998) (sending of summons and complaint for a civil forfeiture action by certified mail, when the evidence showed the jail had procedures in place to ensure delivery of certified mail to inmates, was adequate for due process requirements); United States v. Clark, 84 F.3d 378, 381 (10th Cir. 1996) (sending notice of administrative forfeiture proceeding via certified mail to prisoner at jail satisfied due process requirements).

Tennessee Code Annotated section 39-11-707(b) states that "[u]pon seizure of property for forfeiture under this part, the seizing agency or official shall cause to be delivered a written receipt and notice of seizure to the possessor, owner and interest holder as determined from public records." T.C.A. § 39-11-707(b) (2010). This notice of seizure "shall list and describe generally the property seized, the agency or official responsible for the seizure and shall state the procedure for obtaining return of the property." Id.

The Notice of Property Seizure, which listed the amount of currency seized as $1,098,050.88, contained the following certification by Detective Rowney:

> I certify that the above property was seized in violation of the designated statute. I certify that on the 24[th] day of April 2012, I have delivered the original of this notice of seizure to the above named person from whom the property was seized.

Exh. 7 to Forfeiture Hearing. On the signature line for acknowledgment of receipt of the seizure notice, Detective Rowney wrote, "Sent Cert Mail." He then wrote a date of "4/24/12" on the space for the date beside this signature line. At the hearing, Detective Rowney stated that his certification of the notice of seizure was not a lie, but rather "a mistake."

In its order denying the Defendant-Appellant's motion to dismiss the forfeiture count of the indictment, the trial court held that Detective Rowney's delivery by mail of the notice of seizure satisfied the requirement of Tennessee Code Annotated section 39-11-707(b):

-45-

[The Defendant-Appellant] argue[s] that [he was] not served with a notice of seizure as required by Tenn. Code Ann. § 39-11-707(b) . . . . Detective Ro[w]ney testified that he actually gave the notice of seizure to his secretary to mail to [the Defendant-Appellant] on April 24, 2012, instead of "delivering the original to [the Defendant-Appellant]" as he certified on Exhibit No. 7. The Court finds that Detective Ro[w]ney's delivery satisfies the requirement under section (b) that "the seizing agency or official <u>shall cause to be delivered</u> . . . notice of seizure to the . . . owner." (emphasis added).

We conclude that the State established by the preponderance of the evidence that it complied with the procedural and substantive requirements of the applicable forfeiture statutes regarding this notice of seizure. A review of Code section 39-11-707(b) shows that it does not require immediate delivery of the notice of seizure. Moreover, Detective Rowney explained the need to get an accurate count of the money at a bank prior to providing the notice of seizure to the Defendant-Appellant. The Defendant-Appellant has never claimed that he did not receive the notice of seizure sent by certified mail, and the record shows that he had sufficient time, with the assistance of counsel, to file a pre-trial motion asking to dismiss the forfeiture count and to thoroughly challenge the forfeiture of these funds in a post-trial hearing. Therefore, we agree with the trial court that the State provided sufficient proof that Detective Rowney complied with the procedural and substantive requirements of the applicable forfeiture statutes when he delivered the notice of seizure by certified mail to the Defendant-Appellant.

## CONCLUSION

Based upon the foregoing authorities and analysis, we reverse the judgments of the trial court and vacate the Defendant-Appellant's convictions of conspiracy to commit money laundering and conspiracy to possess marijuana in an amount over 300 pounds with intent to sell or deliver. The trial court's order of forfeiture is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE